[No. 77507-9. En Banc.]
Argued October 26, 2006. Decided July 19, 2007.

THE STATE OF WASHINGTON, *Respondent*, v. KIM HEICHEL MASON, *Petitioner*.

912

914

*Nancy P. Collins* (of *Washington Appellate Project*), for petitioner.

*Daniel T. Satterberg, Interim Prosecuting Attorney*, and *Andrea R. Vitalich, Deputy*, for respondent.

¶1 CHAMBERS, J. — Kim Heichel Mason appeals his conviction for murder, claiming prejudice from multiple errors at the trial court. He argues he was denied his constitutional right to confront a witness against him, and he argues the jury was improperly informed that the State was not seeking the death penalty. He claims a variety of evidence was admitted in violation of the rules of evidence, that his expert witnesses' testimony was improperly excluded, that there was insufficient evidence he murdered the victim in the course of a robbery, and finally that the trial court improperly separated the aggravating factors from the base murder charge in the verdict form. We affirm his conviction.

## FACTS

¶2 Mason was convicted of the murder of his one-time friend Hartanto Santoso. Mason and Santoso became friends while they worked together at a retirement home. As Mason's life became more difficult, his friendship with Santoso deteriorated. Friends suspected Mason was addicted to drugs. On January 23, 2001, Mason invited Santoso to his home. While Santoso's back was turned, Mason choked him into unconsciousness and bound and gagged him. When Santoso awoke, Mason threatened him with a gun and forced him to write his roommate a letter saying he was leaving town. Mason then forced Santoso to write him a check for the balance of his bank account. He also threatened to inject Santoso with drain cleaner. Santoso ultimately calmed Mason down and convinced Mason to release him with the promise not to call the police.

¶3 But the next day, at a friend's urging, Santoso did call the police. Santoso reported his story to several police officers. Based on what Santoso reported, the police searched Mason's home, finding items that corroborated Santoso's story. They arrested Mason, who admitted he strangled and bound Santoso but claimed he did so in self-defense. He denied demanding money or threatening to inject Santoso with drain cleaner.

¶4 The State charged Mason with first degree kidnapping and first degree attempted robbery, but he was released pending trial. After Mason's release, Santoso arranged with county-employed victim's advocate Linda Webb for a civil protective order barring Mason from visiting Santoso. Despite this order, Santoso called Webb upon Mason's release, expressing fear for his life and begging to sleep in jail for safety. Shortly thereafter, Santoso disappeared. All that remained was a blood trail from his apartment to his car. The blood loss was so severe the King County Medical Examiner issued a presumptive death certificate.

¶5 The State alleged that Mason murdered Santoso to eliminate Santoso as the only witness supporting the charges of kidnapping and attempted murder. Relying upon an alibi provided by his girl friend, Marina Madrid, Mason claimed he could not have committed the crime. But, Madrid later recanted and provided police with the details of Santoso's murder. Mason, she claimed, murdered Santoso. Madrid testified that on February 19, 2001, Mason called Madrid, telling her to meet him at the airport with a change of clothes. Later that night, Madrid met Mason at the airport; Mason's hands were covered with blood and he told Madrid, "Santoso won't be a problem anymore." Report of Proceedings (RP) (Apr. 29, 2003) at 98. Mason had been cut on his right thigh and asked Madrid to sew the wound shut. On their way home, Mason threw out a bloody knife and bloody clothes. Police later recovered the knife. Deoxyribonucleic acid (DNA) evidence established the blood on the clothes and in the car belonged to Santoso. DNA evi-

dence further established that blood found in Santoso's vehicle belonged to Mason and was located where the driver's right thigh would be.

¶6 The State charged Mason with aggravated first degree murder. The State introduced evidence from police officers and the victim's advocate who testified about what Santoso told them before he disappeared. Needless to say, Santoso was never interviewed by Mason's defense team. After a 10-week trial, a jury found Mason guilty. The trial court imposed a sentence of life without possibility of parole. The Court of Appeals affirmed and we granted review. *State v. Mason*, 127 Wn. App. 554, 126 P.3d 34 (2005); *State v. Mason*, 157 Wn.2d 1007, 139 P.3d 349 (2006).

## THE CONFRONTATION CLAUSE

■■■ ¶7 Mason contends his Sixth Amendment confrontation rights were violated by the introduction of statements purportedly made by Santoso.[1] Statements made to police by Santoso before he disappeared were admitted at Mason's trial. Mason challenges only the testimony of witnesses associated with the police.[2] Mason contends that the admission of these statements violated his Sixth Amendment right to confront witnesses against him. The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

¶8 Mason relies on *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), a watershed

---

[1] The right of the accused to confront witnesses against him is also protected by article I, section 22 of the Washington State Constitution. We do not reach the argument that our state constitution provides greater protection in this case as such an argument was not adequately argued or briefed. *State v. Gentry*, 125 Wn.2d 570, 612, 888 P.2d 1105 (1995).

[2] For the first time, in his supplemental brief to this court, Mason seeks review of the statements reported by the emergency room physician who treated him following the January 23 assault. We grant the State's motion to strike this portion of the brief as untimely. *State v. Korum*, 157 Wn.2d 614, 624-25, 141 P.3d 13 (2006).

decision reformulating the conception of the confrontation clause. Before *Crawford*, the leading case on the confrontation clause was *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), which allowed a trial court to admit the out-of-court statement of an unavailable witness even without prior opportunity for confrontation if it bore an "adequate 'indicia of reliability.' " *Id.* We followed this approach in *State v. Crawford*, 147 Wn.2d 424, 54 P.3d 656 (2002), and decided the statements at issue were reliable and thus admissible, despite the defendant's lack of opportunity to confront the witness. The United States Supreme Court reversed, holding that the statements in question were subject to the right of confrontation. *Crawford*, 541 U.S. at 68.

¶9 Under *Crawford*, 541 U.S. 36, "testimonial" statements must be subject to confrontation to be admissible. Such statements, the Supreme Court observed, cause the declarant to be a "witness" within the meaning of the confrontation clause, triggering its protections. The Court did not give a comprehensive definition of "testimonial" but observed that the "core" class of "testimonial" statements included those " 'pretrial statements that declarants would reasonably expect to be used prosecutorially.' " *Id.* at 51 (quoting Br. for Pet'r at 23). The Court also seemed to quote with approval a brief that described testimonial statements as " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Id.* at 52 (quoting Br. for Nat'l Ass'n of Criminal Defense Lawyers et al. as *Amici Curiae* at 3).

¶10 In *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Supreme Court again addressed the confrontation clause. The cases involved statements made to law enforcement personnel during an emergency call and a crime scene investigation. The Court carefully limited its discussion of "testimonial" to the facts at hand but restated that statements "are testimonial when the circumstances objectively indicate that there is no . . .

ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. Thus the objective test seemed to shift from the declarant in *Crawford* to the interrogator in *Davis,* leading Justice Clarence Thomas to complain that district courts were now "charged with divining the 'primary purpose' of police interrogations." *Id.* at 834 (Thomas, J., dissenting). It may be more accurate to say that until the Supreme Court more fully develops precisely what is "testimonial" under the confrontation clause, all courts will be divining the intent of our nation's highest court. With this background in mind, we will examine the statements Mason challenges.

THE STATEMENTS

### *Corporal Haslip*

¶11 First, Mason challenges the testimony of Corporal John Haslip, Santoso's first police contact. At trial, Corporal Haslip repeated the details of Santoso's story about being choked, gagged, threatened with a gun and drain cleaner, and being forced to write a note and a check. The testimony survived a hearsay objection on the theory it was, despite the fact that 24 hours had elapsed from the attack to the report, an excited utterance. The Court of Appeals concluded that the admission of Corporal Haslip's testimony may have violated Mason's right to confront witnesses against him but that the error was harmless. *Mason,* 127 Wn. App. at 565.

¶12 After the Supreme Court's decision in *Crawford* but before *Davis,* the Court of Appeals assumed for sake of argument that Santoso's statement to Corporal Haslip was testimonial. *Id.* In light of *Davis,* we agree. An emergency occurred—Santoso was assaulted and kidnapped by Mason. The emergency ended, Santoso went to sleep, awoke the next day, and then reported the crime. It is surely true that Santoso was afraid and wanted protection from a very real

threat. Almost every person reporting a crime, in some sense, seeks the protection of the police. But the test announced by the Supreme Court in *Davis* looks to the "primary purpose" of the interrogation. *Davis*, 547 U.S. at 822. A prerequisite, the court announced, is that an emergency is "ongoing." *Id.* The reason is that a statement made when there is no ongoing emergency does not "objectively indicat[e] that the primary purpose . . . is to enable police assistance to meet an ongoing emergency." *Id.* The significant lapse of time between the emergency Santoso endured and his report to Corporal Haslip, combined with the fact that the statements were made miles away from the scene of the emergency in a safe police station, convince us the statements were testimonial.

## Detectives Berberich, Malins, and Roze

¶13 Mason challenges the testimony of Detectives John Berberich, Anne Malins, and Kristi Roze. Detective Berberich repeated Santoso's statement that he was terrified for his life. He also relayed portions of Santoso's story to explain why he seized particular items during a search of Mason's apartment. The court admitted the testimony for that purpose but read to the jury a limiting instruction admonishing them not to use the evidence for its truth. Similarly, Detective Malins reported Santoso's statement that he partially wrote a check for $700 to Mason and, at his demand, to explain why she seized his checks. The court admitted the statement with a limiting instruction stating that it was not to be considered as evidence of anything other than why Detective Malins took the check into possession. Mason also objects to the testimony of Detective Roze, who testified that Santoso said he was terrified and requested to sleep at the station house. The trial court ruled Santoso's expression of fear could be admitted only to show Santoso's state of mind at the time.[3] The trial court ruled

---

[3] In a homicide case, the general rule is that statements by the victim, typically expressing fear of, or anxiety about, the defendant, are not admissible under the

Santoso's request to sleep at the station house was a question, not a statement of fact, and therefore by definition could not be offered for its truth.

¶14 The Court of Appeals reasoned that the statements repeated by Detectives Berberich, Roze, and Malins were not offered for their truth and thus were not subject to the confrontation clause. *Mason*, 127 Wn. App. at 566 (citing *Crawford*, 541 U.S. at 59 n.9). Mason challenges this proposition, arguing that statements admitted as "background" or "state of mind" hearsay exemptions violate the confrontation clause when they are in fact used for their truth by the jury or prosecutor. He argues the statements were, in spite of the court's limiting instructions, used to establish the truth of Santoso's claims. Mason correctly notes that courts ought to guard against any "backdoor" admission of inadmissible hearsay statements. The State, however, calls our attention to a parenthetical statement found in footnote 9 of *Crawford*: "The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985)).

¶15 Certainly, *Crawford* and *Davis* require that we carefully examine the admission of every statement secured by the police primarily for investigative purposes. However, the *Crawford* Court also said, "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protections to the vagaries of the rules of evidence." *Id*. at 61. Whether or not the United States Supreme Court would approve the introduction of Santoso's entire testimonial story to explain the admission of exhibits or someone's state of mind, under one theory or another that the evidence was not offered for its truth is, at the very least, debatable. Courts use analytical tools such as whether the statements were or were not hearsay, or were

state of mind exception because the victim's state of mind is deemed irrelevant. *See State v. Powell*, 126 Wn.2d 244, 266, 893 P.2d 615 (1995) (prosecution witnesses should not have been permitted to recount murdered wife's out-of-court statements that she was afraid of her defendant husband).

exceptions to hearsay, or whether they were offered for their truth to determine if statements are testimonial. These tools may, like reliability, subject to judicial abuse the right of confrontation. Deciding which statements are testimonial, and which are not, may be difficult until the Supreme Court develops the definition of "testimonial" further. However, we are not convinced a trial court's ruling that a statement is offered for a purpose other than to prove the truth of the matter asserted immunizes the statement from confrontation clause analysis. To survive a hearsay challenge is not, per se, to survive a confrontation clause challenge.

¶16 An appellate court's conclusion that a statement was properly admitted for a purpose other than to prove its truth does not affirm that the ruling was *correct*; it affirms no more than that the trial court's ruling was *reasonable*. We review the admission of hearsay for an abuse of discretion. *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997).

¶17 Discretion is abused only if the trial court's "decision is manifestly unreasonable or is based on untenable reasons or grounds." *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003) (citing *Stenson*, 132 Wn.2d at 701). A confrontation clause challenge is, on the other hand, reviewed de novo. *State v. Price*, 158 Wn.2d 630, 638-39, 146 P.3d 1183 (2006). Our decision that a hearsay ruling was reasonable does not preclude deciding the statement was intended to establish a fact and that it was reasonable to expect it would be used in a prosecution or investigation; in other words, that it was testimonial. However, because we adopt the doctrine of waiver by forfeiture below, we find it unnecessary to decide whether the statements reported by Detectives Berberich, Malins, and Roze were testimonial. Furthermore, as we discuss below, any of the errors Mason claims were harmless. Mason either forfeited his confrontation objection with regard to Santoso or the error was harmless.

## Linda Webb

¶18 Finally, Mason challenges the testimony of Linda Webb, a domestic violence victim's advocate, who testified that while she helped Santoso form a safety plan, he was reluctant and afraid. She repeated Santoso's statements following Mason's release from jail: Santoso said he believed Mason would kill him and begged for the safe haven of jail. Webb reported Santoso's statement that he felt threatened because of Mason's family relationship with a police officer. She reported that he based this belief on his experience in Indonesia. She explained that Santoso said he could not relocate because his family in Indonesia depended on his earnings; he could not risk losing his job and thus starving his family.

¶19 The Court of Appeals concluded, "[e]very statement Webb testified to involved Santoso's profound fear and his pleas for help. Santoso was seeking protection, not bearing witness to a crime." *Mason*, 127 Wn. App. at 568. Santoso may have, in his own mind, been securing protection, but the test is objective. In *Crawford,* the Supreme Court suggested courts consider whether the statements were made under " 'circumstances which would lead an *objective witness reasonably to believe* that the statement would be available for use at a later trial.' " *Crawford,* 541 U.S. at 52 (emphasis added) (quoting Br. for Nat'l Ass'n of Criminal Defense Lawyers et al. as *Amici Curiae* at 3). Santoso's personal reasons are not dispositive.

¶20 Santoso's statements were made outside the context of an emergency. He met with Webb six days after the assault and called her a couple days after that, when Mason was released from jail. Santoso was certainly afraid and certainly sought protection. However, he did not describe events as they happen "to *resolve* the present emergency." *Davis,* 547 U.S. at 827. His statements were not "a call for help against [a] bona fide physical threat." *Id.* These statements would be viewed by an " 'objective witness' " as

" 'available for use at a later trial.' " *Crawford*, 541 U.S. at 52 (quoting Br. for Nat'l Ass'n of Criminal Defense Lawyers et al. as *Amici Curiae* at 3).

¶21 The State has conceded, and we agree, that Corporal Haslip's statements were testimonial. We also find that many of the statements Santoso made to Linda Webb were testimonial. The State urges, however, that Mason forfeited his right to confront Santoso when he intentionally procured Santoso's absence by murdering him. Mason cannot, the State contends, complain of the natural result of his actions. If he wanted to confront Santoso, he should not have killed him. This doctrine, called "forfeiture by wrongdoing," has received elevated attention since *Crawford* but is an issue of first impression in this state.

## FORFEITURE BY WRONGDOING

¶22 The State argues that even if it was error to admit Santoso's testimonial statements, Mason forfeited his confrontation rights by causing the witness to be unavailable in the first place. Whether or not to adopt the doctrine of forfeiture by wrongdoing is an issue of first impression for Washington State. Under this doctrine, defendants who are responsible for a witness' unavailability at trial forfeit their right to confront the missing witness.

¶23 Every federal circuit has adopted the forfeiture doctrine, as have 21 states. The Supreme Court provided an explanation for the recent emergence of this doctrine. "The *Roberts* approach to the Confrontation Clause undoubtedly made recourse to this doctrine less necessary, because prosecutors could show the 'reliability' of *ex parte* statements more easily than they could show the defendant's procurement of the witness's absence." *Davis*, 547 U.S. at 833.

¶24 Justice Antonin Scalia has explained that the forfeiture doctrine is grounded in equity. "[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confronta-

tion claims on essentially equitable grounds." *Crawford*, 541 U.S. at 62. The high court reiterated its approval of the doctrine in *Davis,* remanding *Hammon v. State*, 829 N.E.2d 444 (Ind. 2005), to the Indiana courts to consider, if appropriate, the application of the doctrine. "The Indiana courts may (if they are asked) determine on remand whether such a claim of forfeiture is properly raised and, if so, whether it is meritorious." *Davis*, 547 U.S. at 834.

¶25 The doctrine is older than *Crawford*; the Supreme Court approved of it in the 1878 case of *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 158, 25 L. Ed. 244 (1878). More recently, and more bluntly, an appellate court in Connecticut defended the doctrine with the quip, " '[t]hough justice may be blind it is not stupid.' " *State v. Henry*, 76 Conn. App. 515, 533, 820 A.2d 1076 (2003) (quoting *State v. Altrui*, 188 Conn. 161, 173, 448 A.2d 837 (1982)).

¶26 We agree that equity compels adopting the doctrine of forfeiture by wrongdoing. In this case, we will not allow Mason to complain that he was unable to confront Santoso when Mason bears responsibility for Santoso's unavailability. Mason made his right impossible to implement; he has only himself to blame for its loss.

¶27 Alternatively, Mason argues for a narrow application of the forfeiture by wrongdoing doctrine. Mason argues a forfeiture is equal to a waiver and thus he cannot lose his right of confrontation unless he knowingly and intelligently waives it. Therefore, he reasons, those who obtain witnesses' absences for a reason other than to prevent their testimony have not knowingly and intelligently waived their confrontation rights and thus evade the rule of forfeiture.[4] We disagree.

---

[4] Mason argues the jury found that Mason did not intend to keep Santoso from testifying when it rejected the aggravating factor stating the murder was "related to the exercise of official duties . . . to be performed by Hartanto Santoso . . . a prospective witness in an adjudicative proceeding." Clerk's Papers at 557. However, a jury's conclusion that there is a reasonable doubt as to whether Mason's reason for murdering Santoso was to keep him from testifying does not preclude a court from concluding, based on a lower standard of proof, that this was his intent. Furthermore, we reject the notion that such a specific intent is required.

¶28 The rule of forfeiture is distinct from waiver. Forfeiture is grounded in equity—the notion that people cannot complain of the natural and generally intended consequences of their actions. Specific intent to prevent testimony is unnecessary. Knowledge that the foreseeable consequences of one's actions include a witness' unavailability at trial is adequate to conclude a forfeiture of confrontation rights. The finding of a *specific* intent to keep a witness from testifying, argued by Mason, is more than is warranted by the "equitable" grounds upon which the rule is based.

¶29 The rule of forfeiture does require a finding of fact that the defendant's conduct prevented the witness' testimony. The State advocates a preponderance of the evidence standard for proof of that finding of fact. As the State points out, the trial judge is the gatekeeper, and standard pretrial evidentiary determinations employ the preponderance standard. Many critical evidentiary determinations, including those involving core constitutional rights, are made by trial judges based upon the preponderance standard. A majority of the courts that have adopted forfeiture by wrongdoing apply the preponderance standard. However, the issue of forfeiture by wrongdoing is unique in that the trial judge must often rule on the ultimate question: did the accused kill the alleged victim? There is a debate as to whether or not forfeiture by wrongdoing permits bootstrapping.

¶30 New York concluded that forfeiture of the right of confrontation warrants a more exacting standard of proof, adopting the clear, cogent, and convincing standard. *People v. Geraci*, 85 N.Y.2d 359, 367, 649 N.E.2d 817, 625 N.Y.S.2d 469 (1995). The high court of New York observed that "a defendant's loss of the valued Sixth Amendment confrontation right constitutes a substantial deprivation." *Id*. Although, as the State points out, standard pretrial evidentiary determinations employ the preponderance standard, we conclude the stakes are simply too high to be left to a mere preponderance standard. We agree with New York and adopt the minority view. We hold, in deciding whether

to apply the doctrine of forfeiture by wrongdoing, the trial court must decide whether the witness has been made unavailable by the wrongdoing of the accused based upon evidence that is clear, cogent, and convincing. We recognize that this is not an easy standard to meet, but the right of confrontation should not be easily deemed forfeited by an accused.

¶31 We conclude Mason was responsible for Santoso's unavailability by clear and convincing evidence, and thus he forfeited his right to confront Santoso.

## HARMLESS ERROR

¶32 Confrontation clause error may be harmless. *State v. Davis*, 154 Wn.2d 291, 304, 111 P.3d 844 (2005). In *Davis*, we adopted the "overwhelming untainted evidence" test: if the untainted evidence is overwhelming, the error is deemed harmless. *Id.* at 305 (citing *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)). If there is no "reasonable probability that the outcome of the trial would have been different had the error not occurred," the error is harmless. *State v. Powell*, 126 Wn.2d 244, 267, 893 P.2d 615 (1995).

¶33 Any confrontation clause error is harmless in this case. Everything Santoso said to the police he said to others, including his roommate Dean Andersen, his supervisor Lisa Schulke, his treating physician Dr. Gregory Gross, and his sister Nina Kandiani. The jury heard his account of the attack, his fear for his life, and his concern for his family in Indonesia from these sources. Had the jury not heard these statements from the police, they would still have heard them from multiple other sources whose testimony Mason does not challenge. Further, DNA evidence linking Mason to the crime scene, his obvious motive, and the testimony of Madrid were untainted and overwhelming. Any error in the admission of these statements was harmless.

## INFORMING THE JURY ABOUT THE DEATH PENALTY

¶34 During voir dire, the judge instructed the jury venire members about their obligation to apply the law as directed by the court. The trial judge was concerned that a juror who opposed the death penalty might disqualify him- or herself on those grounds and that the loss of such jurors would be a disadvantage to the defense. After discussion with counsel, the judge composed the answer he would use if a juror were to ask about the death penalty. He commented, "[i]t was my belief when we first started to have these discussions, and it's even more firmly my belief now, that to not inform the jury that this is not a death penalty case, in my view, would be prejudicial to the defense." RP (Apr. 1, 2003) at 10. The court expressed the view that people who would opt off a jury panel because they oppose the death penalty would be naturally prodefense. Therefore, he concluded that failing to inform the jury about the death penalty, if someone inquired, would prejudice Mason.

¶35 When the judge announced that he intended to disclose to the venire that the Mason case did not involve the death penalty, defense counsel objected, stating, "I think that in light of the prevailing case law, the defense needs to object, understanding that we will essentially defer to the Court on this matter." *Id.* at 7. In response, the judge asked defense counsel how his proposed answer would prejudice the defense, saying, "[a]nything you can help me with, I would certainly appreciate it. I have been thinking about this a lot, as I've told you, over the months as we have been leading up to this moment." *Id.* Defense counsel responded that he could "come up with a reason" but that he did not know if it would be very "compelling." *Id.* He suggested there was a "possibility" a jury may be more likely to convict a defendant if it knows that the defendant will not be put to death, but counsel admitted that he did not think that was a particularly compelling reason. *Id.* at 8.

¶36 The court then asked whether any of the jurors would be unable to enforce or apply the law as instructed. One particular juror responded, "If it were the death penalty. I don't support the death penalty. I would have a hard time with that." *Id.* at 31. The judge responded:

> You should not concern yourselves with what penalty may be administered in the event the jury reaches a finding of guilty, except that the fact a penalty may follow conviction should make you careful.
>
> In response to [the juror's] statement, I will respond by informing you that this is not a capital case. In other words, this case does not involve a request for the death penalty. The jury will not be involved in any way in determining any sentence which may be imposed, in the event that a jury reaches a verdict of guilty.
>
> Aside from that consideration, would anybody find themselves in a position where they might not be able to apply the law as instructed, if you found yourself thinking that it might be changed somewhat?
>
> [No response.] All right. Thank you.

*Id.* at 32-33. Defense counsel did not object to any juror nor make any motions based upon the court's informing the jury that the case did not involve the death penalty.

¶37 The Court of Appeals, noting that the judge was extraordinarily thoughtful about the death penalty issue, concluded that the trial judge did not err by informing the jury that the death penalty was not involved in Mason's case. We disagree. We addressed this issue in some detail in *State v. Townsend*, 142 Wn.2d 838, 15 P.3d 145 (2001). In *Townsend*, the prosecutor moved and the judge agreed to inform the jury that " 'this is not a death penalty case.' " *Id.* at 842 (quoting RP at 11). Defense counsel did not object and Townsend was convicted of first degree murder. On review, we concluded that the failure of defense counsel to object "fell below prevailing professional norms." *Id.* at 847. We noted, " '[i]t is [a] well established [rule] that when a jury has no sentencing function, it should be admonished to "reach its verdict without regard to what

sentence might be imposed." ' " *Id.* at 846 (first alteration in original) (quoting *Shannon v. United States,* 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) (quoting *Rogers v. United States,* 422 U.S. 35, 40, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975))). We explained our reasoning:

> This strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations. The only exception that allows juries to know about sentencing consequences is in a death penalty trial, and even then the jury is to consider the penalty only after a determination of guilt.
>
> The State argues, however, that a failure to inform the jury that the death penalty is not involved will unfairly prejudice the prosecution since some jurors may always vote to acquit or opt out if they fear the death penalty may be involved. The converse could also be argued just as well: if jurors know that the death penalty is not involved, they may be less attentive during trial, less deliberative in their assessment of the evidence, and less inclined to hold out if they know that execution is not a possibility. Rather than giving jurors information about the penalty in a noncapital case, we believe that voir dire should be used to screen out jurors who would allow punishment to influence their determination of guilt or innocence and then, through instructions, jurors should be advised that they are to disregard punishment. This process should satisfy the concerns raised by the State. We see no reason to create an exception for noncapital murder cases.

*Id.* at 846-47. If this court was incorrect in *Townsend* then, upon a proper record, our decision should be challenged in a truly adversarial proceeding. If our reasoning was flawed in *Townsend,* and there are legitimate strategic and tactical reasons why informing a jury about issues of punishment would advance the interest of justice and provide a more fair trial, then counsel should zealously advance the arguments. In the present case, counsel for Mason objected; it was error for the trial judge to inform the jury that the death penalty was not implicated. However, we note defense counsel's objection was, at best, lukewarm, and the record suggests that defense

counsel may have encouraged rather than discouraged the judge. Further, no objection was advanced to the selection of any juror or to the panel. On this record, we find the error harmless.

## EXCLUSION OF EXPERT TESTIMONY

¶38 Mason argues the trial court erred by excluding a defense expert's assertion that 30 to 80 percent of the public cannot be excluded as potential contributors to the genetic material found in a mixed blood sample. The State's expert examined a mixed blood sample taken from Santoso's car. His analysis established two strands of DNA; one was identified as the victim's. The State's expert testified that the statistical probability the second strand of blood found in Santoso's car belonged to someone other than Mason was one in several trillion. The State alleged that defense expert witness Dr. Randell Libby was prepared to testify that 30 to 80 percent of the population were possible matches in any given "mixed-DNA sample" (where multiple samples of blood are found, for example). The State challenged this opinion, and only this opinion, as unsupported.

¶39 It appears from Dr. Libby's declaration that he does not in fact hold to this belief: "[t]he State's lack of understanding is clearly illustrated in the State's Memorandum . . . where they have *incorrectly* and *erroneously* stated my opinion 'that at least 30% of the general population could not be excluded as possible contributors to those mixtures.' " Clerk's Papers at 471-72 (emphasis added). The ruling, therefore, should have had no impact on Dr. Libby's testimony; he never intended to assert that which the trial court excluded. The decision not to call Dr. Libby was wholly that of Mason and his lawyers and is not under review. The issue on appeal is the exclusion of Dr. Libby's opinion concerning the size of the pool of potential matches. We affirm, and it appears Dr. Libby would agree, that such an opinion is without scientific support and was therefore properly excluded.

## ADMISSION OF OPINION TESTIMONY REGARDING MASON'S GUILT

¶40 Mason argues the trial court improperly allowed King County Medical Examiner Dr. Richard Harruff to testify that he had issued a presumptive death certificate and improperly admitted the certificate into evidence. Dr. Harruff testified that the volume of blood loss he observed, and the fact Santoso was missing, warranted issuing a presumptive death certificate. He did not testify that Santoso was in fact dead nor whether Mason was involved. During trial, the court reversed itself and excluded the presumptive death certificate with an instruction to the jury not to consider it. Mason claims the court improperly placed before the jury a state expert's opinion as to an ultimate factual issue and element of the offense, and the prejudice could not be undone by the instruction provided.

¶41 We disagree. "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." ER 704; *see also State v. Baird*, 83 Wn. App. 477, 485, 922 P.2d 157 (1996). Dr. Harruff did not testify that Mason was guilty of murder; he simply opined that Santoso had sustained life-threatening wounds. His testimony and the certificate itself were properly admitted.

## ADMISSION OF EVIDENCE OF PRIOR BAD ACTS

¶42 Mason challenges the admission of a variety of evidence, arguing they were improperly admitted as evidence of prior bad acts in violation of ER 404(b).[5] We address each in turn.

---

[5] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

¶43 The trial court admitted evidence indicating Mason possessed a loaded gun and two knives. Mason argues the evidence showing he possessed these weapons violated ER 404(b)'s exclusion of evidence of "prior bad acts." The Court of Appeals made no ruling with respect to the application of ER 404(b), holding that his ER 404 challenge was not preserved because at trial Mason objected to the relevance of the weapons, not that the evidence should have been excluded as "prior bad acts." *State v. Kendrick*, 47 Wn. App. 620, 634, 736 P.2d 1079 (1987); *State v. Guloy*, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985). Mason failed to object on the basis of ER 404(b); the Court of Appeals correctly ruled that the issue was not preserved for appeal.[6]

¶44 Mason also challenges the admission of testimony regarding his reported prior sexual encounter with another man. The Court of Appeals ruled that Mason failed to object to evidence of a prior sexual encounter with a male on the basis of ER 404(b), precluding review. Although an objection based on relevance fails to preserve an appeal based on ER 404(b), an objection based on prejudice is another matter. Mason did not object to this particular evidence as irrelevant, he objected that it was "prejudicial." RP (May 13, 2003) at 78. An objection based on "prejudice" is adequate to preserve an appeal, based on ER 404(b), because it suggests the defendant was prejudiced by the admission of evidence of prior bad acts.

¶45 We disagree with the Court of Appeals' application of *Kendrick*, but we affirm for other reasons. A trial court's ruling under ER 404(b) will not be disturbed absent

---

[6] The same reasoning applies to Mason's appeal of the introduction of testimony that he sought sexual relations with a group of women. The objection at trial was based on relevance; an ER 404(b) challenge was not preserved for appeal. It also applies to Mason's challenge of the admission of evidence establishing his financial troubles: a high interest loan he did not pay back, car payments he failed to make, and considerable consumer and credit card debt. Mason objected at trial that this evidence was not relevant but was overruled. Mason also appeals the introduction of evidence he attempted to encourage sexual submissiveness in women by observing certain of their intimate bodily functions. He did not object at trial and thus the issue is not preserved for appeal.

a manifest abuse of discretion such that no reasonable judge would have ruled as the trial court did. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). Admission of the evidence on the basis of "other purposes," pursuant to ER 404(b), was not an "abuse of discretion." *Id.* The State contends this evidence undercut Mason's claim that he had no sexual relationship with Santoso and was so surprised and disturbed by Santoso's sexual advance that it prompted a violent attack. This "other purpose" was adequate to render the trial court's decision to admit the evidence within the scope of a "reasonable judge." *Id.*

¶46 Mason argues a single passage of a book he owned titled *The Ancient Art of Strangulation*, blown up and presented to the jury, was improperly admitted. The section described the author's opinion that there exists an "innate intimacy" in asphyxiation and that it is "associated" with the sex act. Mason argues these passages prejudiced him to the extent they tended to show he was someone who would take extreme acts for sexual satisfaction. The State does not suggest any probative value specific to these passages. Instead, it argues the book's discussion of strangulation and murder are evidence of premeditation. It is not apparent how premeditation is demonstrated by passages in a book explaining the sexual aspects of strangulation; at best this suggests motive and, as Mason points out, the State did not argue a sexual motive compelled the murder.

¶47 However, the trial record indicates Mason objected to the State's introduction of fingerprint evidence on these and other pages, but not to the introduction of the pages themselves. Mason has failed to preserve his objection.

¶48 In his petition for review, Mason seems to object to the admission of evidence demonstrating he was not truthful on certain employment and financial forms. Mason makes no specific arguments. Instead, he provides generic analysis of evidence law and the standard of appellate review, then lists the various evidence, all of which he claims were improperly admitted. Insofar that Mason argues that the evidence should not have been admitted, the

argument is raised for the first time in his petition. Mason offers no arguments and cites no authority; he does not identify which specific evidence he is appealing nor does he explain how he was prejudiced by its admission.

¶49 Mason appeals the trial court's decision to admit the testimony of convenience store manager Diana Jones describing an interaction between Mason and Santoso. She reported that Mason silently stared at Santoso until Santoso paid for Mason's drink. She described the interaction as a "very controlling situation." RP (Apr. 17, 2003) at 32. Mason argues this evidence was improperly admitted to prove his propensity to act the same way on a future occasion, in violation of ER 404(b). However, the State introduced the evidence to demonstrate the nature of Mason's relationship with Santoso—that of control and domination. The State theorized Mason lost control over Santoso and the rest of his life, responding with frustration and rage targeted at his former subservient "friend." Evidence admitted for "other purposes" conforms to ER 404(b). The trial court's decision to admit the evidence was within the scope of a "reasonable judge." *Thang*, 145 Wn.2d at 642.

¶50 Finally, Mason appeals the "excessive introduction of testimony and physical evidence" of his January 23 attack on Santoso. He concedes the fact he was being prosecuted for the attack on January 23 was relevant to one of the charged aggravating factors but argues the excessive detail prejudiced the jury. However, the evidence proved motive and intent. The "excessive" evidence of the crime proved the likelihood Mason would have been convicted and thus his desperation to prevent the trial from happening by killing Santoso. The probative purpose of this evidence is valid, and the trial court was within its discretion in admitting it.

¶51 We agree with the Court of Appeals that a limiting instruction should have been given, but the failure to give one did not affect the outcome and thus was harmless error. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). In his arguments before this court, Mason

does not challenge the Court of Appeals' ruling that the error was harmless.

## INSUFFICIENT EVIDENCE MASON COMMITTED MURDER IN THE COURSE OF A BURGLARY

¶52 Mason was convicted of aggravated first degree murder, and the jury found that he committed the murder in the course of a burglary. He argues there was insufficient evidence of this latter claim. On review, we consider whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have concluded Mason murdered Santoso in the course of a burglary. *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005). A burglary occurs when someone unlawfully enters or remains in a dwelling with the intent to commit a crime against a person or property therein. *E.g.*, RCW 9A.52-.020(1) (first degree burglary). Police found a cinder block in Santoso's apartment and a broken window. Mason told a witness he used the cinder block to gain entry. Neighbors heard bangs, crashes, thumps, and moans coming from the apartment the night of the murder. The pattern of Santoso's blood found in the apartment indicated he was stabbed there five times; the volume of blood lost indicated the wounds were fatal. A reasonable jury could have concluded Mason unlawfully entered Santoso's apartment and murdered him there.

¶53 Further, any error is harmless. The jury found the murder was committed while a no-contact order was in effect, providing an independent basis for aggravated murder.

## FAILURE TO INCLUDE AGGRAVATING FACTORS IN THE "TO CONVICT" INSTRUCTIONS

¶54 Mason argues the trial court erred by bifurcating the "to convict" and "aggravating factors" instructions in violation of his right to a jury verdict based on a reasonable doubt standard as articulated in *Apprendi v.*

*New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The jury was issued bifurcated instructions and bifurcated verdict forms on two issues: first, whether the murder was committed with premeditated intent (Mason does not dispute the first degree murder instructions) and, second, whether any aggravating factors were present. Mason argues the separate verdict forms deprived him of the jury's consideration of the charge in its totality. We addressed an identical issue in *State v. Mills*, 154 Wn.2d 1, 109 P.3d 415 (2005), which Mason seeks to overturn. In *Mills*, we unanimously approved the bifurcated approach provided that the jury makes both findings beyond a reasonable doubt. *Id.* at 9-10. As we explained in *Mills*, *Apprendi* and its progeny do not require a specific format for the jury to conclude the existence of facts raising a punishment beyond its statutory maximum; it requires a jury make the decision based on the reasonable doubt standard. *Id.* This the jury did. Mason's right to a jury finding based on a reasonable doubt standard was protected.

## CONCLUSION

¶55 We affirm the conviction of Kim Heichel Mason for the reasons stated above.

BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶56 ALEXANDER, C.J. (concurring in result) — Although I concur with the result the majority reaches, I write separately to express the view that the doctrine of forfeiture by wrongdoing should not be adopted by this court, particularly in a factual circumstance such as we have here. In that regard, I agree with Justice Sanders's conclusion that where the alleged conduct that rendered the declarant-victim unavailable forms the factual basis for the charge against the defendant, the doctrine should be eschewed. Dissent at 940. For a trial court to determine, during the trial, that the defendant has committed the charged crime,

albeit by a standard less than "beyond a reasonable doubt," is offensive to the presumption of innocence that must prevail throughout the trial. In Washington, judges regularly instruct jurors to "keep an open mind and not decide any issue in the case until it is submitted to [them] for [their] deliberation." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.01, at 5 (2d ed. 1994). Trial judges should not be held to a lesser standard.

¶57 I concur in the result here, though, because everything Hartanto Santoso said to Detectives John Berberich, Anne Malins, and Kristi Roze, as well as to Linda Webb, he said to other persons who testified at trial. Consequently, the confrontation clause error is harmless.

C. JOHNSON, J., concurs with ALEXANDER, C.J.

¶58 SANDERS, J. (dissenting) — Because Kim Mason's confrontation rights were violated by the introduction of statements purportedly made by Hartanto Santoso, because the majority adopts and applies the doctrine of forfeiture by wrongdoing, and because it was not harmless error for the trial judge to inform the jury that the case did not involve the death penalty, I dissent.

*(1)   The Admission of Out-of-Court Statements Violated Mason's Right To Confrontation*

¶59 The trial court admitted the testimony of four police officers and a victim's advocate regarding statements Santoso allegedly made prior to his disappearance. Under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), testimonial statements must be subject to confrontation. The majority, after determining Corporal John Haslip's statements and certain statements made by Linda Webb are testimonial[7] under *Crawford* and

---

[7] Because the majority adopted the doctrine of forfeiture by wrongdoing, it declined to determine whether the statements of the other three officers were testimonial. The majority concluded, "any of the errors Mason claims were harmless. Mason either forfeited his confrontation objection with regard to Santoso or the error was harmless." Majority at 922.

*Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), ultimately concludes, "[a]ny confrontation clause error is harmless in this case" as "[e]verything Santoso said to the police he said to others," including his roommate, supervisor, treating physician, and sister. Majority at 927.

¶60 If admittance of just *one* of these statements is not harmless, reversal is required. For an error to be harmless, "it must appear beyond a reasonable doubt that the error did not contribute to the ultimate verdict." *State v. Williams*, 158 Wn.2d 904, 917, 148 P.3d 993 (2006). Applying this stringent standard to the present facts, we cannot conclude that the admittance of the officers' testimony was harmless beyond a reasonable doubt simply because other witnesses' testimony overlapped in subject matter with that of the officers.

¶61 Testimony from a law enforcement officer will likely impact a juror differently than if identical information is conveyed through the relative of a victim. Juries routinely consider all characteristics of witnesses (their relation to the parties, employment, and personal interests) in weighing the value or credibility of their testimony—that is, in fact, the *purpose* of a jury trial and why appellate courts defer (with regard to factual conclusions) to the judgment of the fact finder.

¶62 Because this court considers only the written record and is not privy to the expressions, demeanor, and body language of the witnesses, we are in no position to predict the effect such characteristics might have had on the jury's decision-making, and we certainly may not presume which witnesses' testimony the jury found compelling and which testimony tipped the balance in favor of a particular outcome. *See State v. Robinson*, 24 Wn.2d 909, 917, 167 P.2d 986 (1946). Thus, we cannot possibly conclude beyond a reasonable doubt that the outcome in this case would have been the same absent the testimony of the officers and the victim's advocate.

*(2) Application of the Doctrine of Forfeiture by Wrong-doing Is Inappropriate*

¶63 As the majority notes, whether or not to adopt the doctrine of forfeiture is an issue of first impression for this court. The majority ultimately concludes "equity compels adopting the doctrine" and states,

> [W]e will not allow Mason to complain that he was unable to confront Santoso when Mason bears responsibility for Santoso's unavailability. Mason made his right impossible to implement; he has only himself to blame for its loss.

Majority at 925. The majority's subsequent observation that the doctrine of forfeiture by wrongdoing necessarily requires the trial judge to "rule on the ultimate question: did the accused kill the alleged victim?" explains, quite succinctly, my hesitation in adopting such a rule. Majority at 926.

¶64 Under facts such as these (where the conduct rendering the declarant-victim unavailable is the very crime charged), the court must assume the defendant's guilt *prior* to trial, an assumption which offends the presumption of innocence imbedded in our state and federal constitutions. *See State v. Crediford*, 130 Wn.2d 747, 759, 927 P.2d 1129 (1996) ("[E]very person accused of a crime is constitutionally endowed with an overriding presumption of innocence, a presumption that extends to every element of the charged offense." (citing *Morissette v. United States*, 342 U.S. 246, 275, 72 S. Ct. 240, 96 L. Ed. 288 (1952))). For this reason, both state and federal courts have refused to apply the doctrine of forfeiture by wrongdoing to cases where the defendant is charged with the very same conduct that allegedly caused the unavailability of the witness; scholars have referred to such a phenomenon as "reflexive forfeiture." *See* Richard D. Friedman, *Confrontation and the Definition of Chutzpa*, 31 Isr. L. Rev. 506, 521-22 (1997) ("Suppose that the conduct that rendered the declarant-victim unavailable, rather than occurring at some time

after the crime charged, *was the crime charged.* . . . In such a case, for the court to conclude that the accused committed the act rendering the declarant-victim unavailable, the court must also conclude that the defendant committed the criminal act charged, because those two acts are the same." (emphasis added)).

¶65 In *State v. Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), the defendant was charged with sexual assault of a child. The State argued the defendant waived his right to confront the minor victim by intimidating her and threatening to punish her if she told anyone about the abuse. *Id.* at 699. But the court refused to hold the defendant had waived his right to physical confrontation, noting that the cases cited by the State involved defendants "scheming to obstruct justice by tampering with a witness *after* the crime in question had occurred . . . ." *Id.* The court distinguished such cases from the situation at bar where the defendant had threatened the victim "*during* the commission of the very crimes with which he is charged." *Id.* The court concluded,

> The constitutional right of confrontation would have little force . . . if we were to find an implied waiver of that right in every instance where the accused, in order to silence his victim, uttered threats during the commission of the crime for which he is on trial.

*Id.*

¶66 Similarly, in *People v. Maher*, 89 N.Y.2d 456, 677 N.E.2d 728, 654 N.Y.S.2d 1004 (1997), the defendant was convicted of intentional murder, felony murder, and criminal contempt. Although New York had recognized the doctrine of forfeiture by wrongdoing, the court refused to apply it to the present facts, as application of the rule "would require the trial court . . . to decide the ultimate question for the jury in the same case, i.e., whether the defendant caused the victim's death." *Id.* at 462 (footnote omitted).

¶67 *United States v. Lentz*, 282 F. Supp. 2d 399 (E.D. Va. 2002), *aff'd in part, rev'd in part on other grounds*, 383 F.3d

191 (4th Cir. 2004), presents facts similar to the case at bar. In *Lentz* the defendant was charged in a three-count indictment for kidnapping resulting in the death of Dorris Lentz. *Id.* at 409. Ms. Lentz's body was never found. *Id.* The government sought to introduce statements of several witnesses who had conversations with Ms. Lentz regarding Ms. Lentz's fear of the defendant and defendant's prior threats and abuse. *Id.* The government argued the forfeiture by wrongdoing exception applied to all of Ms. Lentz's statements because the defendant had "procured the unavailability of Ms. Lentz by killing her." *Id.* at 426. The court, however, recognizing the illogic of applying the exception, observed,

> Essentially, the Government asks the Court to find Defendant guilty of killing Ms. Lentz by a preponderance of the evidence in order to allow the evidence to be admitted to prove Defendant killed Ms. Lentz beyond a reasonable doubt.

*Id.* The court concluded that applying the exception would ignore the well-settled presumption of innocence and "deprive a defendant of his right to a jury trial [by] allow[ing] for a judge to *preliminarily convict a defendant of the crime on which he was charged.*" *Id.* (emphasis added). It makes no sense for the evidentiary rules of trial to depend upon the court's pretrial determination of the defendant's guilt or innocence.

¶68 Here, unfortunately, the majority's adoption of a "clear and convincing" standard (as opposed to a preponderance of the evidence standard) does not cure the general illogic of the doctrine of forfeiture by wrongdoing. I would refrain from applying the doctrine to the present facts because doing so invades the province of the jury by forcing the judge to determine Mason's guilt prior to his trial.

   *(3)*  *It Was Not Harmless Error for the Trial Judge To Inform the Jury that Mason's Case Did Not Involve the Death Penalty*

¶69 During voir dire the trial judge informed the jury that Mason's case did not involve a request for the death

penalty. The majority determined, "it was error for the trial judge to inform the jury that the death penalty was not implicated" but concluded the error was harmless. Majority at 930-31. The majority provides an incoherent explanation of its determination, stating,

> [W]e note defense counsel's objection was, at best, lukewarm, and the record suggests that defense counsel may have encouraged rather than discouraged the judge. Further, no objection was advanced to the selection of any juror or to the panel. On this record, we find the error harmless.

Majority at 930-31.

¶70 In *State v. Townsend*, 142 Wn.2d 838, 840, 15 P.3d 145 (2001), we held it is error to inform the jury during voir dire that a case does not involve the death penalty. *Townsend* states, "[t]his strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations." *Id.* at 846; *see also State v. Reece*, 79 Wn.2d 453, 457, 486 P.2d 1088 (1971) ("rehabilitation is a vital concern of the state; it is not a concern of the jury while it ponders the sole question of guilt or innocence"). We acknowledged in *Townsend* that "such instructions [regarding the death penalty], if anything, would only increase the likelihood of a juror convicting the petitioner." *Townsend*, 142 Wn.2d at 847. Yet here, the majority inexplicably determines the judge's mention of the death penalty was harmless.

¶71 Capital punishment is an issue both morally divisive and politically charged; as such, this is not an instance where it is either prudent or just to speculate as to whether the judge's instruction influenced the outcome of Mason's trial. In fact, if *anything* should leave us hesitant (or unwilling) to guess how a juror will react to certain information, it is the mention of capital punishment. The majority's reasons for holding otherwise are neither clear nor coherent.

¶72 For this, and the reasons stated above, I dissent and would reverse Mr. Mason's conviction.

MADSEN, J., concurs with SANDERS, J.

Reconsideration denied November 27, 2007.