

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73242-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ADEM GERZIC, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 7, 2016 |
| | ) | |

BECKER, J. — On the night of March 4, 2014, CC called 911 and reported that her boyfriend, appellant Adem Gerzic, was threatening to shoot and kill her if she ended their relationship. When police responded, CC told Officer Colin Cufley that Gerzic had previously sent her threatening text messages. She showed him these messages on her cell phone. Gerzic was arrested and charged with one count of felony harassment-domestic violence.

CC failed to appear at Gerzic's trial despite the fact that the court issued a material witness warrant. The State entered into evidence a redacted transcript of CC's 911 call and photographs of the text messages that CC showed Officer Cufley. Gerzic was convicted as charged. He appeals.

CONFRONTATION CLAUSE

Gerzic first argues that his right to confrontation was denied when a redacted recording and transcript of CC's 911 call were admitted into evidence.

He contends that some of CC's statements during the 911 call are testimonial and should have been excluded. Our review is de novo. State v. Mason, 160 Wn.2d 910, 922, 162 P.3d 396 (2007), cert. denied, 553 U.S. 1035 (2008).

Under the Sixth Amendment, a criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause bars the admission of testimonial statements, with certain exceptions not relevant here. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The United States Supreme Court has adopted the "primary purpose" test to determine whether a statement is testimonial. Under this test:

> *Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.* They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (emphasis added).

The Washington Supreme Court has drawn from Davis four factors to determine whether the "primary purpose" of police interrogation is to enable assistance to meet an ongoing emergency:

> (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant. (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? A plain call for help against a bona fide physical threat is a clear example where a reasonable listener would recognize that the

2

speaker was facing such an emergency. (3) What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? For example, a 911 operator's effort to establish the identity of an assailant's name so that officers might know whether they would be encountering a violent felon would indicate the elicited statements were nontestimonial. (4) What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe?

State v. Koslowski, 166 Wn.2d 409, 418-19, 209 P.3d 479 (2009) (footnote omitted).

Because this is a domestic violence case, we focus on the threat to the victim and assess the ongoing emergency from the perspective of whether there was a continuing threat to her. See Michigan v. Bryant, 562 U.S. 344, 363-64, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (explaining the Court's ongoing emergency analysis in Davis). The duration and scope of an emergency may also depend in part on the type of weapon employed. Bryant, 562 U.S. at 364. CC told the 911 operator that Gerzic threatened to kill her and told her he was going to get a gun from his car. She was calling for help against a bona fide physical threat, just as the caller in Davis. See Davis, 547 U.S. at 827.

Gerzic argues that the emergency ended when CC told the 911 operator: "I think he just went back to his car. I think he heard me calling you. So probably he's gonna leave. I don't know. But I'm so scared." We disagree. CC was speculating that Gerzic might not return because he heard her call the police. This does not mean the emergency was at an end. CC also heard Gerzic say he was going to his car to get a gun. We have specifically rejected the argument

3

that an emergency necessarily ends when an assailant leaves the scene of a domestic assault. State v. Reed, 168 Wn. App. 553, 567-68, 278 P.3d 203, review denied, 176 Wn.2d 1009 (2012). Here, as in Reed, CC was without police protection and her assailant was still at large. There was every reason to believe that he would return with a gun, as that was his stated intention. Any reasonable listener would recognize that CC was facing an ongoing emergency. See also State v. Ohlson, 162 Wn.2d 1, 18, 168 P.3d 1273 (2007) (ongoing emergency where assailant had fled scene because, objectively viewing the course of events, there was every reason to believe that assailant might return again and perhaps escalate his behavior). Cf. Koslowski, 166 Wn.2d at 432 (no ongoing emergency where assailants fled the scene in a car before police arrived and no evidence suggested they might return or pose further danger to any identifiable person).

The operator's questions during this portion of the call were generally designed to ascertain the identity of CC's assailant, his location, and whether he posed a threat to police—indicating, under Koslowski, that CC's answers were nontestimonial. For example, the operator asked CC for Gerzic's full name and date of birth, if CC heard him at the door still or knew where he went, and how he would react to police officers contacting him. Viewed objectively, these elicited statements were necessary to resolve the ongoing emergency. See Davis, 547 U.S. at 827 (even the operator's effort to establish the identity of the assailant was necessary to resolve the present emergency, "so that the dispatched officers might know whether they would be encountering a violent felon").

As to the level of formality, the conversation the 911 operator had with CC was not a formal investigation. As in Davis, CC's statements were provided over the phone to a 911 operator "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." Davis, 547 U.S. at 827 (contrasting this to the formality of the interrogation in Crawford, where the witness gave calm responses to interrogation at the police station with the officer-interrogator taping and making notes of her answers).

Finally, CC was describing "current events as they were actually occurring, requiring police assistance. Koslowski, 116 Wn.2d at 418. She was reporting that Gerzic told her she would not make it to work the next day and that he was going to kill her, his ex-wife, and himself. She was seeking police assistance, not establishing past events for the sake of later prosecution.

We conclude that the primary purpose of CC's 911 call was to enable police assistance to meet an ongoing emergency. CC's statements were nontestimonial, and their admission did not violate Gerzic's Sixth Amendment right to confrontation.

## AUTHENTICATION OF TEXT MESSAGES

At trial, Officer Cufley testified that CC told him she had received threatening text messages from Gerzic in the past. She showed him the text messages on her phone. He further testified that the photographs offered by the State fairly and accurately depicted the messages that CC showed him. The State then moved to admit the photographs of the text messages into evidence. Gerzic objected on the basis of lack of foundation, but the trial court admitted the

photographs. Gerzic argues that the trial court erred in admitting the photographs of these text messages. We review a trial court's admission of evidence for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

Gerzic first contends that the text messages were not properly authenticated because the State did not prove that he sent the messages. Authentication is a threshold requirement designed to assure that evidence is what it purports to be. State v. Payne, 117 Wn. App. 99, 106, 69 P.3d 889 (2003), review denied, 150 Wn.2d 1028 (2004). The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. ER 901(a). Because the proponent must make only a prima facie showing of authenticity for purposes of establishing admissibility, ER 901 is met "'if the proponent shows enough proof for a reasonable fact finder to find in favor of authenticity.'" In re Detention of H.N., 188 Wn. App. 744, 355 P.3d 294 (2015), quoting Payne, 117 Wn. App. at 108.

We have recently considered the issue of text message authentication in H.N., 188 Wn. App. 744, and in State v. Bradford, 175 Wn. App. 912, 308 P.3d 736 (2013), review denied, 179 Wn.2d 1010 (2014). Bradford is especially analogous to Gerzic's case. Bradford would not accept repeated attempts by his girlfriend, Vilayphone, to end their affair, and she eventually obtained an antiharassment protection order against him. Bradford, 175 Wn. App. at 917. In the month after she obtained this order, January 2011, Bradford tried to contact

Vilayphone by sending text messages to her friend, who would forward the messages to Vilayphone. Bradford, 175 Wn. App. at 917. After receiving each of these forwarded messages, Vilayphone would call 911 and show the responding officer the forwarded text messages displayed on her cell phone. Bradford, 175 Wn. App. at 917-18. The responding officer would then record each text message verbatim in his notebook, and later copy them verbatim into his police report. Bradford, 175 Wn. App. at 918. At trial, the responding officer read these text messages aloud, quoting directly from his police reports. Bradford, 175 Wn. App. at 918.

We held that there was sufficient evidence introduced to support a finding that the text messages that were read to the jury were written and sent by Bradford, despite the fact that he did not acknowledge sending them. Bradford, 175 Wn. App. at 928-29. The messages were consistent with his other "obsessive behavior" reflecting a "desperate desire" to communicate with Vilayphone; the content of the messages themselves indicated that Bradford was the individual who sent them; and Vilayphone and her friend who received the messages testified to their belief that the text messages were from Bradford. Bradford, 175 Wn. App. at 929-30.

In this case, as in Bradford, CC showed the text messages on her cell phone to the responding officer and told him that they had been sent by Gerzic. These messages include a photograph of Gerzic holding a shotgun to his throat with the caption "This You want?" Other messages include "I Love You Christine!," "Are you with me or no?," "I am happy with You don't do this to me

7

please," and "You want me dead?" These messages were consistent with Gerzic's other obsessive behavior reported by CC in her 911 call, including threats to put a bullet in her head and to kill her, himself, and his ex-wife when she tried to break up with him. They reflect his "desperate desire" to be with CC and his rejection of any attempt to end the relationship. The photograph that Gerzic sent of himself also identifies him as the sender. In addition, CC received these text messages from a contact listed in her phone as "Adem," which is Gerzic's first name.

Significantly, in Bradford, the State did not even offer photographs of the text messages to authenticate them, as the State has here. Instead, the officer read the text messages from his police report, which had been copied from his notebook, which had been copied from Vilayphone's cell phone. By providing photographs of the text messages, the State here has offered better proof to authenticate than in Bradford.

Gerzic emphasizes that neither the sender nor the receiver, CC, corroborated or acknowledged the text messages. Although CC did not testify at trial, the responding officer testified that CC told him she received the text messages from Gerzic. The trial court is not bound by the rules of evidence when making a determination as to authenticity. State v. Williams, 136 Wn. App. 486, 500, 150 P.3d 111 (2007), citing ER 104(a). For this reason, the trial court could consider CC's out-of-court statement that Gerzic sent the text messages when determining the authenticity of the text messages. Gerzic does not acknowledge sending the text messages, but neither did Bradford, and we

8

nevertheless held in Bradford that there was sufficient evidence for authentication.

Gerzic also highlights the fact that there was no forensic evidence that he sent the text messages. He points to the fact that in Bradford, the police did a "phone dump" to generate a report itemizing each text message the phone had received during a specific time period. But the part of this report that was admitted into evidence did not include the January 2011 text messages that the responding officer read from his police report. There was no forensic evidence corroborating Bradford's January 2011 text messages, just as there is none here.

We conclude the trial court did not abuse its discretion in finding that the State made a prima facie showing of authenticity. Gerzic failed to prove that no reasonable fact finder would have taken the position adopted by the trial court.

Next, Gerzic contends that his right to confrontation was violated when the responding officer testified that CC told him the text messages were from Gerzic. But Gerzic did not object to this testimony. Therefore, to have this claim reviewed for the first time on appeal, Gerzic must demonstrate that it is manifest constitutional error. RAP 2.5. A manifest error is an error that is unmistakable, evident, or indisputable, and that has practical and identifiable consequences in the trial of the case. State v. Hayes, 165 Wn. App. 507, 514-15, 265 P.3d 982 (2011), review denied, 176 Wn.2d 1020 (2013). Even if CC's out-of-court statement had been excluded, the photographs of the text messages would still have been admissible and, as detailed above, they provided sufficient evidence that the messages were from Gerzic. In addition, the jury would still have heard

Officer Cufley's testimony that CC showed him the messages on her phone.

Gerzic has not demonstrated that any constitutional error is manifest.

Affirmed.

Becker, J.

WE CONCUR:

Leach, J.

Cox, J.