IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77302-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JIMMY LEE KING, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 16, 2019 |

SCHINDLER, J. — A jury convicted Jimmy Lee King of domestic violence assault in the second degree of C.B.-K. and witness tampering. By special verdict, the jury found King and C.B.-K. were family members. Following the bifurcated trial on whether the crimes of assault in the second degree and witness tampering were aggravated domestic violence offenses, the jury found the State proved the aggravating factor beyond a reasonable doubt. The court sentenced King to life in prison under the Persistent Offender Accountability Act, RCW 9.94A.570. King seeks reversal, arguing (1) the court violated his right to present a defense and abused its discretion by denying his motion to admit the out-of-court statement of C.B.-K. that "she did not want to appear for court," (2) the court violated his right to a fair trial by admitting redacted jail telephone calls that referred to a potential life sentence, (3) his attorney provided

ineffective assistance of counsel by not filing a motion for a new trial, and (4) cumulative error deprived him of the right to a fair trial.[1] We affirm.

Domestic Violence Assault

Karla Landis and her spouse live at 5804 Renton Avenue South. August 18, 2016 was a hot summer night. Landis and her spouse were sitting outside on the front porch. Landis saw a tall, slender, African American woman, later identified as C.B.-K., "[c]ome out of the house" across the street at 5805 Renton Avenue South. C.B.-K. was wearing what looked like a "loose" "pink dress." Landis watched as C.B.-K. "walked down the street quietly." A man, later identified as Jimmy Lee King, "came out of the house" across the street and started "yelling down the street" to C.B.-K. to "come back." Landis said King "was talking really nicely and saying things like, 'Please come back.' "

After King went back inside, Landis saw C.B.-K. walking back toward the house. When C.B.-K. "paused" in the middle of the street in front of Landis' house, Landis asked her, " 'Do you need help?' " C.B.-K. turned, "looked" at Landis, and said, " 'Call it in.' " C.B.-K. went back inside the house across the street. Landis called 911.

Seattle Police Department (SPD) Officer David Warnock and SPD Officer Lloyd Harris arrived first at approximately 11:50 p.m. followed by SPD Officer Terry Persun. After talking briefly to Landis, Officer Warnock saw C.B.-K. walk out of the house across the street. Officer Warnock and Officer Harris walked across the street to talk to C.B.-K. When Officer Warnock shined his flashlight on C.B.-K., he "could see that she had bruises and was bleeding on her face." Officer Harris could see C.B.-K.'s "face was swollen and it looked like she had been involved in an assault." Officer Persun was

---

[1] King also claims the court violated his right to a fair trial and his attorney provided ineffective assistance of counsel by not excusing a juror for bias. Because the record shows the juror was not a member of the jury panel, we need not consider these arguments.

standing approximately 10 feet away and could see C.B.-K. was wearing "a pink nightgown" and "had an injury to the side of her face, an injury to her lips, and I could see that she had been assaulted."

Officer Warnock told C.B.-K. she was being recorded and asked what happened. C.B.-K. "had a hard time speaking initially." C.B.-K. "said something about her husband and at that point Mr. King emerged from around the back of the house."

While Officer Harris and Officer Persun detained King, King yelled at C.B.-K., " 'You called the police on me. Bitch. You fucking bitch. I can't believe you called the cops on me.' " King said, " 'Oh, now I'm going to jail, bitch.' " The officers saw "blood on his hands."

The police arrested King and moved him to a patrol car away from C.B.-K. But King continued to yell at C.B.-K. and "call[ ] her names." C.B.-K. told Officer Warnock she "had been assaulted by her husband." C.B.-K. "specifically" told Officer Persun that "she had been strangled by Mr. King." Officer Warnock took photographs of King's hands.

Officer Persun called the Seattle Fire Department to "provide medical attention" for C.B.-K. Officer Persun took photographs of C.B.-K.'s injuries while she was standing in front of the house.

C.B.-K. showed Officer Persun and Officer Warnock the bathroom in the basement of the house. Officer Warnock said the room "looked like someone had been sleeping on the floor of the bathroom" with blankets and "bedding on the floor." The officers saw "blood on the walls" and "damage to" the bathroom door. The officers took photographs of the bathroom and the bathroom door.

3

C.B.-K. agreed to give a statement to Officer Persun before medics arrived. The statement was audio and video recorded.

Arraignment

On August 20, 2016, King called his sister Regina "Gina" King from the King County jail. King told Regina[2] to tell C.B.-K. that "she need a affidavit from the psychiatrist sayin' that she lied." King told Regina that C.B.-K. had to say that "she lied and I didn't do nothin' to her, and the police tricked her, and I didn't do nothin' to her and she's not gonna testify against me. And have it notarized and take it to the district attorney and they'll let me out immediately." King said, "[T]ell her to go, that's the only way I'm gonna get out."

| | |
|---|---|
| [KING]: | Okay, listen though. Listen to me. All you gotta do is-all she got to do is-I had Tammy[3] do that long time ago. Like, she went South End uh South End Mental Health unit in the Rainier Vista, say she-uh he said she was a schizophrenic liar and that she lied and I didn't jump on her. I got out the same day! They took it off the record. That's the only way they're gonna do (unintelligible). |
| [REGINA]: | Well. So go to a mental health place, anyone, tell her to sign a affidavit sayin' that you didn't do nothin' to her, the police tricked her. . . |
| [KING]: | Yeah. |
| [REGINA]: | and then take it to a district attorney? |
| [KING]: | Yeah, the district attorney is down-that's the dis-I'm in district court. They tryin' to get me. Because she can. . . |
| [REGINA]: | Okay. |
| [KING]: | get-I read the things she said. I-I picked her up in the hair with my-with-I can't even pick her up (unintelligible). |
| [REGINA]: | She-she said-she said you-you whooped her ass good. Today. . . |
| [KING]: | No, uh. . . |
| [REGINA]: | she explained to me and showed me what. . . |
| [KING]: | lis-lis-listen to me. . . |
| [REGINA]: | you did. |

. . . .

---

[2] We refer to Regina King by her first name for clarity.
[3] Tammy is King's ex-wife.

4

[KING]: Okay, well now it's over with, okay. All she need to do is. . .
[REGINA]: Yeah.
[KING]: go-go to m-mental health, go to. . .
[REGINA]: Well, I'll tell her, cause she kind a. . .
[KING]: (unintelligible).
[REGINA]: actin' bitter right now. She actin' a little bitter.
[KING]: Why, why, why?
[REGINA]: Cause you whooped her ass!
[KING]: Man, tell her to go, that's the only way I'm gonna get out.
[REGINA]: That you whooped-she said you whooped. . .
[KING]: Uh uh (unintelligible) her. . .
[REGINA]: her ass. . .

. . . .

[KING]: Listen though, all she gotta do is go to the mental health unit (unintelligible). . .
[REGINA]: Okay, well. . .
[KING]: and just. . .
[REGINA]: (unintelligible).
[KING]: do the affidavit and give it to the public-give it to the district-the uh district court.

. . . .

[KING]: Okay, listen. Tell [C.B.-K.] all she gotta do is go to a psychiatrist!
[REGINA]: I'mma te-I'm-I'mma tell her all that. I'mma tell her tonight.
[KING]: Get a affida-uh get uh then all she can-uh and just, when I go to court, she can just say he didn't do-when they call my name, don't say nothin', just get up and say I didn't do it.

. . . .

[REGINA]: I already told her to do all that.
[KING]: The affidavit's gonna kill it anyway.

. . . .

[REGINA]: I'll tell her. I'll tell her.
[KING]: Yeah, okay. Hold her to that.
[REGINA]: I'll tell her.

. . . .

[REGINA]: But uh but when you get out, I don't give a fuck how drunk you get, keep your hands off of her.
[KING]: You're right. You're absolutely right.
[REGINA]: Keep-keep your hands off of her. . .

. . . .

[KING]: Yeah, okay Gina. . . . [T]ake care a that for me, okay?
[REGINA]: Yeah, alright.[4]

---

[4] Most ellipses in original.

5

On August 22, 2016, the State charged King with domestic violence assault in the second degree of C.B.-K. by strangulation in violation of RCW 9A.36.021(1)(g) and RCW 10.99.020.

At the arraignment on August 30, 2016, King entered a plea of not guilty. C.B.-K. attended the arraignment with SPD victim advocate Kayleigh Mcniel. The prosecutor requested the court impose a no-contact order. Mcniel told the court that C.B.-K. wanted to have telephone contact with King:

> She needs to be able to have contact with the defendant.
> They did recently move into a new home together with her three children; however, this home is actually owned by his relatives, and in order for her to maintain contact with them, they would like to at least be able to have telephone contact with him if the Court feels that a no contact order is necessary.

The court imposed a no-contact order that allowed King and C.B.-K. to have telephone contact.

Jail Calls

Between August 30, 2016 and May 3, 2017, King made hundreds of telephone calls to C.B.-K. from the King County jail.

After the arraignment on August 30, King called C.B.-K. at 12:16 p.m. to ask what she told the SPD victim advocate.

| | |
|---|---|
| [KING]: | Did you ask for—for the no-contact to be dropped? Did you ask (unintelligible) that? |
| [C.B.-K.]: | Uh, yeah I've been told 'em that. I wrote 'em a letter. I told [Mcniel] on the phone and then I just went to make sure to reiterate. |
| [KING]: | Um, so okay that's what you wanted to do? |
| [C.B.-K.]: | Yeah, that's what I told them to do. I didn't want—I—. . . |
| [KING]: | Uh, because anything you say in there it goes on the record. Like if you had said somethin' else, whatever had said, they would a just—they would a let me out right then, see? Whatever would a—would a been said. That's why—but |

6

that's why—but that's what I was tryin' tell you about the whole thing.

But anyway, uh what's goin' on with the house? So what's happenin' with the house? 'Cause we can't really talk uh . . . .

. . . .

[KING]: The judge gave me. . .

[C.B.-K.]: I . . .

[KING]: permission—. . .

[C.B.-K.]: put—. . .

[KING]: the judge gave me permission to—to um—to have contact with you. But we can't be talkin'—. . .

[C.B.-K.]: I know.

[KING]: we can't be talkin' about the case. You know.

[C.B.-K.]: I know.

. . . .

[KING]: Are you still my baby?

[KING]: Are you still my baby?

[C.B.-K.]: (Unintelligible).

[KING]: Huh? Hello?

[C.B.-K.]: Yeah.

[KING]: I said are you still my baby? Hello?

[C.B.-K.]: Yes.

[KING]: Why you not answerin' me?

[C.B.-K.]: I said yes.

[KING]: Yes what?

[C.B.-K.]: Yes, Jimmy.

[KING]: Yes Jimmy what?

[C.B.-K.]: I'm still your baby but you gotta trust me. You gotta trust me.[5]

At 7:33 p.m. that same day, King called C.B.-K. to ask whether she had contacted a psychiatrist and was "workin' with that doctor." C.B.-K. said, "[Y]up. . . . At CPC."[6]

[KING]: Okay. Yeah, okay. Well uh. Anyway uh. But uh. You get that letter from the company? You get that company letter? That says you gonna be there with him? Says you gonna be there with him?

[C.B.-K.]: Mmmhmm.

[KING]: Kay you got to pay attention to that letter. You have to! That's mandatory. You gotta trust me on this one. OK?

---

[5] Most ellipses in original.

[6] Community Psychiatric Clinic.

7

On August 31, King told C.B.-K., "I need you to uh really um take consideration of that letter uh from the doctor, man uh for real man, you have to-that's somethin' that was mandatory, ya know." King called C.B.-K. again on August 31:

[KING]: D-okay, but I-I really need you to talk to the doctor tomorrow. Dr. um um uh McClain, Okay? Uh did you get that from Gina yet?

[C.B.-K.]: She said she don't know what-she said she kind a thinks she knows what we're talkin' about, but. . .

[KING]: Well (unintelligible)

[C.B.-K.]: she ain't got nothing yet.

. . . .

[C.B.-K.]: I just told her whatever she gets, if it's. . .

[KING]: Okay.

[C.B.-K.]: from you or. . .

[KING]: Just. . .

[C.B.-K.]: whatever, just bring it over.

[KING]: (unintelligible).

[C.B.-K.]: Put it in my mailbox.[7]

On September 1, King called C.B.-K. to reiterate she needs to contact the psychiatrist:

[KING]: [B]ut—but they gave me—they—they gave me contact on the phone. And that (unintelligible).

[C.B.-K.]: Yeah.

[KING]: Uh, so how—how can you not—how can I not say I love you? How can I tell you. . .

[C.B.-K.]: What?

[KING]: How can I not say somethin'. They say—whatever I say, whatever I tell you it can be persuadin' you to make up the—the—the—the—change a—change your testimony or somethin' or whatever. But I—you're my wife. What—how can I not say I love you? How can I not? How can I not say that? You know so I don't know. . .

. . . .

[KING]: . . . But call and see if they got any mail over there or whatever. 'Cause you need to get to that man. Um—um you need to get to that. 'Cause I ain't called. . .

[C.B.-K.]: I know. I checked with. . .

[KING]: nobody.

---

[7] Second ellipsis added.

[C.B.-K.]:     him yesterday.
[KING]:     I ain't called no—I ain't called nobody but you and these lawyers.[8]

On September 2, King called C.B.-K. multiple times. At 12:19 p.m., King called C.B.-K. to tell her that because "they're gonna try to use your statement against me no matter what you wanna do," she should "take the fifth."[9]

> I said what if my wife don't want to testify or whatever. He said uh they'll still use the statement. What she said is—uh the mes—he said the one case they—the lady said they'll say uh, but did you make that statement? Then you'll say yes, then they'll still d—get me, regardless of what the fuck you wanna do. You know (unintelligible) there's this one lady, he said that they—she just took the fifth. But them your statements? I just take the fifth. So that's what. . .

[C.B.-K.]:     Right.[10]

At 5:40 p.m., King asked C.B.-K. if she "call[ed] that boy." After C.B.-K. said, "I didn't," King told her, "I told you before all you had to do was this one little thing. I would've been home. I would've been gone! That's the one little teeny simple thing, and one day you're gonna realize that that one little simple easy little thing, and it's right in your . . . lap." C.B.-K. said she could tell the court that "whatever happened happened, but I still love my husband. I want my husband home. . . . Of course a person's gonna be hurt after somethin' like that, but I'm—that's not me right now. I want my husband home." King said, "[T]here's no way I can go home if you say that. There's no way. You know? There's just no way. And that's why I said the lawyer said you would have to take the fifth."

---

[8] Third and fourth ellipses added.
[9] Fifth Amendment to the United States Constitution.
[10] Ellipsis in original.

King called C.B.-K. again at 7:01 p.m.:

[T]hey're gonna use your statement. I don't give a fuck if you come in there and say well I love 'em and we could remarry and, but if they say did-did you make them statements, then they can use-then they'll uh they'll convict me anyway. That's why they said if you get up uh you can plead the Fifth and say well I'm not gonna say I said that, then they can't do nothin' to me. But if you go in that courtroom and say well I love 'em and we're sorry and we was fightin', be we-that don't matter, I'm goin'-I'm goin' to prison. Don't matter unless you take the Fifth or don't come at all or don't whatever.

King called C.B.-K. on September 10:

(Unintelligible) everything, about everything. You know I had a um—last night I prayed and the Lord told me, he said that—he says, (unintelligible) Jim. (Unintelligible) said well, (unintelligible)—you was talkin' about pity party . . . . I—I (unintelligible), he said no, she talked to the right people, you know. And uh he said well she did everything.

King told C.B.-K., "I go ta court on the 13th. And then whatever they go do, they gonna . . . come after me. But they can't come after me without you."

On September 26, King called C.B.-K. at 12:47 p.m. to tell her the State will reduce the assault charges if she does not appear at trial:

| | |
|---|---|
| [KING]: | But anyway, everybody in here tells me that um if the person don't come to court, they gotta—they g—they drop it down to a Fourth Degree Assault and—and uh let you go. Right? After trial. |
| [C.B.-K.]: | Uh-huh. |
| [KING]: | Because they can't do nothin' without no victim. You know. |
| [C.B.-K.]: | Right. |
| . . . . | |
| [KING]: | But they said they—you know they can prosecute you but they can't find you guilty because they gotta have a person! You gotta—a person. . . |
| [C.B.-K.]: | Right. |
| [KING]: | to lie. |
| [C.B.-K.]: | Right, right. . . |
| [KING]: | So. . . |
| [C.B.-K.]: | right. |
| [KING]: | But he said—he said this ain't—he said this ain't a misdemeanor where they let you go. . . . |

10

. . . .

[KING]:     if I take a deal I still gotta do time.

[C.B.-K.]:    Right

[KING]:     So I might as well go for the one—the—the gusto. Because I know they ain't got no witness.

[C.B.-K.]:    Right.[11]

In a jail call on February 2, 2017, King told C.B.-K. that his lawyer said, "[I]f your wife doesn't come, they'll probably offer you twelve months. I said I'll take it! He said but if she comes, if she comes, if they make her come, then you gotta testify." King told C.B.-K., "If you come, I gotta take the stand. If you don't come, I don't have to take the stand."

At a hearing on March 31, the prosecutor informed the court that at the request of C.B.-K., the State had made another plea offer. "[T]his is a third strike case, Defendant is facing life in prison if convicted as charged," and the State "unexpectedly reopened an offer to resolve this as a nonstrike felony at the behest of the victim in this case, at the request of the victim." The prosecutor said, "[N]o offer better than that will be made at all as we go forward."

In a telephone call on April 25, King told C.B.-K.:

[KING]:     I'd appreciate it-I'd appreciate it if you'd let me finish talkin'. I'd appreciate that very much. My lawyer came and talked to me and he said that they wanna gimme-they're gonna offer me another deal. So he said he-he said you'll do-becau-because a the tamperin' he said because they got you sayin' your name is [C.] and-and they've got you sayin' I choked you, and they got marks and they got pictures and they got your voice. He said they're not recant-he said they're gonna find ya guilty. He said they're gonna go outta their way to find you guilty, he said because they got you clear and concisely on video camera sayin'-I said well why-why are they tryin' for her. He said because she never said you didn't do it. She said she wasn't goin' to court, but she never told 'em that one time in eight months that you didn't do it.

---

[11] Second, third, and fourth ellipses in original.

> But she said-and she-they'll do it because she-she-she's not comin' to-might not wanna come to court. But in their heart and in their mind, ya know, they feel she said you choked her and there's (unintelligible) and she said that and they're goin'-they're gonna go by it. I said well what if she don't come. You know what, sometimes when. . .

[C.B.-K.]: Mm-hm.

[KING]: sometimes when things happen sometimes, sometime when things happen and your person don't show up, but they-they-they're cheaters. They're cheaters. They'll go outta their way and they said and they will call up all the police in the world to come find you and-and said they will trick you. And so I don't trust you enough because they-they'll have to-they'll have to serve you in person (unintelligible) a subpoena for them to come get you. And you'll probably open the door for 'em.[12]

Amended Information

On April 26, the prosecutor asked the court to rescind the no-contact order that allowed telephone contact. The prosecutor argued the State planned to amend the information to add the charge of witness tampering.

> It was some time ago, and at the time, [C.B.-K.], the victim in this case, appeared and asked the Court to allow for phone contact between the parties. Part of the basis for that was that [C.B.-K.] indicated that she and the defendant have business — business dealings that they needed to discuss.
> Since that time, we have proceeded forward, and at this point, if this case proceeded to trial, the State's prepared to add tampering charges, the basis for which is contained in hundreds of phone calls that I have only recently been able to go through.
> Almost every phone call I can say that I have listened to between [C.B.-K.] and the defendant discusses the case; so I'm asking at this time — and in fact, obviously we are alleging tampering so we think that it's a problem, the discussions regarding the case. So at this point I'm just asking that Your Honor rescind the phone allowance portion of the no contact order as this case proceeds forward.

King objected. King told the court, "We were talking about our business, and like I said, my lawyer came to me last night with a good-faith offer that we was going to

---

12 Ellipsis in original.

12

make a deal. So if I'm — a deal to — to omit — there ain't no tampering if I'm going to take a deal so they might be lying about that."

The court granted the State's motion and imposed a no-contact order with C.B.-K.

On May 12, 2017, the State filed an amended information. In addition to domestic violence assault in the second degree of C.B.-K. by strangulation, the State alleged King committed domestic violence assault in the third degree in violation of RCW 9A.36.031(1)(f), count 2;[13] domestic violence felony harassment in violation of RCW 9A.46.020(1) and (2)(b), count 3; and witness tampering in violation of RCW 9A.72.120, count 4. The State alleged as an aggravating factor that the crimes were part of an ongoing pattern of psychological or physical abuse of the same victim or multiple victims manifested by multiple incidents over a prolonged period of time.

Motion to Quash Subpoena

On May 10, the defense filed and served a subpoena directed to victim advocate Kayleigh Mcniel at SPD headquarters. The subpoena commanded Mcniel to appear for trial on May 16, 2017 at 8:30 a.m. The State filed a motion to quash the subpoena to appear and testify at trial.

At the May 12 hearing on the motion to quash the subpoena, the prosecutor argued there was no dispute the State had complied with CrR 4.7 and provided all discovery. The prosecutor argued Mcniel "does not have testimony that's material at trial."

Defense counsel conceded the statement C.B.-K. made to Mcniel that she did not want to come to court was not admissible at trial but argued Mcniel's testimony was

_____

[13] The State later dismissed the charge of assault in the third degree.

13

"pertinent to the issue of forfeiture by wrongdoing, hence the subpoena." Defense counsel argued that statements C.B.-K. made to Mcniel about whether she "intends to come to court" were material to whether or not King "is at fault for her not coming to court."

> Now, certainly I agree that any statements that . . . the alleged victim . . . may have made to the advocate would be hearsay in the context of a trial, but in the context of a pretrial motion, it doesn't matter, and this is certainly pertinent only to that motion.

Defense counsel requested the court order Mcniel to submit to an interview.

The prosecutor told the court, "I know where this victim is. We have had multiple conversations. She is coming to court whether the defendant wants her to be here or not." However, the prosecutor agreed to stipulate for the purposes of a hearing on forfeiture by wrongdoing that C.B.-K. told Mcniel at the arraignment she "wasn't coming to court." The prosecutor argued the defense did not meet its burden under CrR 4.7(e) to require Mcniel to submit to an interview.

The court ruled the defense did not meet its burden to show materiality under CrR 4.7(e). "I don't think you've shown materiality to go to the next step for additional interviews because you haven't shown that there have been additional statements made to the advocate." The court ordered the State to obtain a statement from Mcniel confirming the statements C.B.-K. made to the victim advocate. That same day, Mcniel sent the prosecutor an "advocate memo" setting forth the statements C.B.-K. made at the arraignment on August 30, 2016. The advocate memo states C.B.-K. told Mcniel that "she did not want to appear for court and was not pressing charges."

14

Pretrial Motions

The trial began on May 17, 2017. The State and the defense agreed to a bifurcated trial on the domestic violence aggravating factor. The court held a CrR 3.5 hearing and addressed the motions in limine. The court ruled the statements King made before and after his arrest were admissible. The prosecutor identified 26 jail telephone calls the State planned to introduce into evidence and play for the jury. Defense counsel agreed to review the transcript of the jail calls and note any objections. Over the course of the next couple of days, the court ruled on objections and redactions to the jail calls.

Admission of Statements C.B.-K. Made to Police

On the first day of trial testimony, the prosecutor requested the court issue a material witness warrant for C.B.-K. The court issued a material witness warrant for C.B.-K.

On the second day of trial testimony, the prosecutor filed a motion to admit C.B.-K.'s statements under the doctrine of forfeiture by wrongdoing. The State cited threats King made to C.B.-K. when he was arrested on August 18, 2016 and statements King made to C.B.-K. in the jail calls.

> It is clear from the number and content of the calls that the defendant's intent is to have [C.B.-K.] absent herself from the trial.
> [C.B.-K.] spoke to defense counsel in November, 2016. Until very recently, she was in regular contact with the assigned victim advocate. She has never recanted her statement as to what happened the night of the incident. [C.B.-K.] respond[ed] to [the prosecutor] and her staff indicating receipt of her subpoena. She was made aware of the trial date and until recently, had received almost daily updates since the time trial began from her victim advocate. [The prosecutor] and the advocate have told [C.B.-K.] that she is obligated to appear in response to her subpoena.
> On May 22, 2017, [C.B.-K.]'s advocate asked her to meet her at the courthouse the following morning for trial. [C.B.-K.] did not appear. The

15

advocate and SPD Det[ective] Pamela McCammon drove to [C.B.-K.]'s house and knocked on her door.

The defense opposed the motion to admit C.B.-K.'s statements. Defense counsel argued King did not tell C.B.-K., " 'Don't come to court.' " Defense counsel cited the statement C.B.-K. made to Mcniel at the arraignment on August 30 that she did not intend to attend the trial.

The court granted the motion to admit C.B.-K.'s statements under the doctrine of forfeiture by wrongdoing. The court found the State proved by clear, cogent, and convincing evidence that King forfeited and waived his right to confrontation and hearsay.[14] The court ruled the statements C.B.-K. made to Mcniel did not negate the threats and persistent demands King made to C.B.-K. in the jail calls.

> [T]his Court finds that there is clear, cogent and convincing evidence that the defendant's threats, the history of domestic violence and persistent telephonic demands of [C.B.-K.] to not testify are the actual cause of her unavailability at trial.
> Furthermore, the Court specifically finds that defendant clearly intended to prevent the witness's testimony. This finding is based on the defendant's conduct as demonstrated in the numerous phone calls and the dynamics of the domestic violence relationship. This defendant has a history of abusing, at least verbally, his wife the night in question after his wife tells police that he has punched, kick, spit on and strangled her — I'm sorry, choked her is what the victim said, the defendant makes a serious — a series of unrelenting threats against his wife in the presence of numerous police officers. The threats include threats to physically harm her through use of his family, as well as threats to take away the home she shares with her two teenage daughters, which is leased to them by the defendant's sister.
> Once the defendant is in jail, he makes numerous, numerous phone calls to his wife as well as numerous other people where he discusses his case. He continuously assures himself and others that his wife not coming to trial in his belief that he will [be] released when that occurs. All of this tampering occurs within the context of the defendant's long history of being prosecuted for domestic violence offenses and the evidence is clear to this Court that he has used that knowledge he has gained from these past experiences to further manipulate his victim.

---

[14] See State v. Dobbs, 180 Wn.2d 1, 320 P.3d 705 (2014).

With this, t[h]e Court will admit her out-of-court statements without any further inquiry.

Trial Testimony

The State called a number of witnesses to testify at trial, including Karla Landis, Officer Warnock, Officer Persun, paramedic Jared Hassing, King County jail sergeant Jennifer Schneider, and sexual assault nurse examiner Teresa Stewart. The court admitted into evidence photographs of C.B.-K., photographs of the bathroom and bathroom door, the statements King made when he was arrested, the patrol car video recording of the interview with C.B.-K., and 26 redacted jail telephone calls.

Officer Warnock testified that the injuries on C.B.-K.'s face were "consistent with, you know, what you see when you expect someone has been hit a few times." Officer Warnock said C.B.-K. "had multiple lacerations on her elbows as well. There was some lacerations on her neck area." Officer Warnock testified that King threatened C.B.-K.

> [H]e kept yelling things at [C.B.-K.], you know, now I'm going to jail. He kept calling her names. He kept calling her a bitch and a faggot and accusing her of sleeping with another man, saying that now she was going to be out of his house. She was going to get kicked out of the house now. And these threats — or these comments just kind continued throughout the entire contact and it never really ceased. Even when he was in the back of my patrol car, he still continued to yell at [C.B.-K.].

The State played the recording of the statements King made before and after his arrest. Officer Warnock testified that he saw blood on King's hands. The State introduced photographs the police took of his hands.

The State introduced the photographs Officer Persun took of C.B.-K. and the downstairs bathroom. Officer Persun described the injuries shown in the photographs.

> I observed she had a bloody area here on her right cheek. This side of her lips were bloody, black and blue. And she had some cuts on her face, a small cut on her neck. It appeared as though she had some redness

17

around her neck. And she had some black and blue underneath her arm, probably from about here to here, and it went from the front to the back. And she just looked like, you know, her head was — it appeared to be lumpy from being assaulted. And also, she had a hoarse voice as well.

Officer Persun said C.B.-K. told him that "she had been strangled by Mr. King." Officer Persun testified that C.B.-K. said she was in the basement bathroom "trying to get to sleep, and to try to stay away from Mr. King because he was angry about some incident that he perceived as being, you know, a cheating situation." C.B.-K. said King was "yelling at her through the door." King "kicked the door in," "spit on her," and "then dumped his beer all over her." C.B.-K. said King "put both of his hands around her neck" and "was squeezing and essentially holding her body up . . . trying to lift her off the ground so that he could choke her out." Officer Persun testified that he took a recorded statement from C.B.-K. The court admitted the CD[15] into evidence and the prosecutor played the audio and video recording for the jury.

The video shows C.B.-K. holding her face and rubbing her neck. C.B.-K.'s voice is hoarse and at times, she struggles to speak and starts crying. C.B.-K. told Officer Persun that because she and King argued earlier that day, she decided to sleep in the basement:

| | |
|---|---|
| VICTIM: | Earlier in—earlier in the day my husband—had got upset with me because I went and ate at a restaurant without him and he didn't—and I didn't tell him about it. So. . . |
| OFC[16] PERSUN: | What's your husband's name? |
| VICTIM: | Jimmy King. |
| OFC PERSUN: | Okay. So where do you normally sleep? In the bedroom. . . |
| VICTIM: | Upstairs in-upstairs in our—one of our bedrooms or. . . |

. . . .

---

[15] Compact disc.
[16] Officer.

18

| | |
|---|---|
| OFC PERSUN: | But because of the earlier argument. . . |
| VICTIM: | But because of the earlier argument, I decided to keep at peace—keep things at peace, to just go downstairs and. . . |
| OFC PERSUN: | Sleep in the basement. |
| VICTIM: | sleep in the basement.[17] |

C.B.-K. told Officer Persun that she locked the basement door but that made King "mad." King kicked in the door and at first, "it was just verbal abuse," but then King poured beer on her, spit on her, took C.B.-K.'s phone, choked her "with both hands," and "threw" her against the wall:

| | |
|---|---|
| VICTIM: | I took my blanket and pillo[w]s—and made a pallet in the—in the room and laid down, and I locked the door because I just wanted to avoid arguing, and I—and everything. Um, so he got mad at that because the door was locked and I was downstairs, and I didn't wanna talk. I insisted on waiting 'til in the morning. He did not want to do that. He started banging on the door. Finally, he kicked it in. First, it was just verbal abuse. Then. . . |
| OFC PERSUN: | Did he threaten your life or. . . |
| VICTIM: | He was threating to whup me, kick my butt. |
| OFC PERSUN: | Okay. |
| VICTIM: | If I don't tell the truth, which I had been telling the truth from the-the beginning. And then he poured beer on me, spit on me, snatched my phone, and he started making random phone calls from my phone. He picked the name out of my contacts and used that to escalate the situation. Which then he started putting his hands on me. I tried to push him off, and that made him even angrier. He tried to choke me with both hands and snatch me up and hit me, threw me against the wall and slammed me down. |
| OFC PERSUN: | So he did choke you with both hands? |
| VICTIM: | Yeah. |
| OFC PERSUN: | Correct? |
| VICTIM: | One in the front and one in the back. |
| OFC PERSUN: | So when he choked you with his hands uh did you pass—did you lose consciousness at any time? |

---

[17] Fourth ellipsis added.

VICTIM:            I don't believe I lost consciousness, but it happened so fast. I wouldn't—I-I don't know.[18]

C.B.-K. told Officer Persun that after King threw her against the wall and onto the floor, he kicked her and punched her with both fists:

| | |
|---|---|
| OFC PERSUN: | So he strangled you, you said. Did he throw you against the wall, did he (unintelligible). . . |
| VICTIM: | He slammed me against the wall and then slammed me down on the floor and hit me a few times. Kicked me. |
| OFC PERSUN: | Did he hit you with a closed fist? |
| VICTIM: | Yeah. |
| OFC PERSUN: | Okay. Which fist do you remember him hitting you with? |
| VICTIM: | I think both. |
| OFC PERSUN: | Okay. |
| VICTIM: | Because my hand—his phone—my phone was in one of his hands so he-he was just coming from both ways. |
| OFC PERSUN: | Okay. Now did he kick you or attempt to kick you? |
| VICTIM: | And then he kicked me once. |
| OFC PERSUN: | Where did he kick you? |
| VICTIM: | Um, in my back. |
| OFC PERSUN: | Okay. Now did he punch you in your face or are those injuries from you hitting the wall. . . |
| VICTIM: | He punched me in my face. |
| OFC PERSUN: | Okay. |
| VICTIM: | In my mouth. |
| OFC PERSUN: | Okay. |
| VICTIM: | Beside my jaw.[19] |

C.B.-K. said she was able to "squeeze[ ]" by King and as she ran outside to get away, she heard him yelling, "I'll kill you."

| | |
|---|---|
| VICTIM: | And then uh I scrambled away that's how blood got all over the place. And I tried to lock him again that's how blood got up on the wall. Cause I was laying against the wall trying to block more hits. |
| OFC PERSUN: | So how did you end up getting outside then? |
| VICTIM: | He backed up. And at first he wouldn't let me go, and then I squeezed up out of there and ran. |

---

[18] Ellipses in original.

[19] Ellipses in original.

| | |
|---|---|
| OFC PERSUN: | So did you run out of the house through the basement? |
| VICTIM: | Yes. I ran out back, and he kept yelling I'll kill you, and you gonna go. . . |
| OFC PERSUN: | He yelled what? |
| VICTIM: | tell the police? You gonna tell the police? I'll kill you before I go to jail.[20] |

C.B.-K. told Officer Persun that she told her neighbor to call 911 and went back home and tried to "hide" in the basement, but King found her and assaulted her again before the police arrived:

| | |
|---|---|
| | I was gonna walk down the hill, but I didn't have no shoes on. So I walked back, and that's when I asked the neighbors did they hear anything. |
| OFC PERSUN: | So you asked one of the neighbors to call the police on him? |
| VICTIM: | No, I just asked if they heard a disturbance. |
| OFC PERSUN: | Oh. |
| VICTIM: | And they say, yeah, we did hear something. I said so you heard a disturbance, and they said yeah. They was like do you need help, are you okay? I said not really. They said, should we call the police? I said, did you hear it, the disturbance, and she said yeah. I said then you should probably call 'em. |
| OFC PERSUN: | Alright, and so. . . |
| VICTIM: | I came back to the house. |
| OFC PERSUN: | Alright, so you came back into the house then after you basically asked your neighbor to call the police for you? Alright. And so what happened once you got back into the house? |
| VICTIM: | So I tried to go hide back in the basement, and he came back in. I put—I fixed the door back up again, so, to lock it again, but he kicked it in again. And he spit in my face and threw beer on me, and I don't remember if he hit me again. |
| OFC PERSUN: | Okay. |
| VICTIM: | And then I ran out. Then that's when I ran back out the back door again and that's when I saw ya'll.[21] |

---

[20] Ellipsis in original.

[21] Ellipsis in original.

21

Seattle Fire Department paramedic Jared Hassing examined C.B.-K. C.B.-K. "was bleeding from her mouth, mostly, like, her lip area." C.B.-K. told Hassing that "she had been hit with fists and that she had been choked." C.B.-K. said that "her neck hurt." But C.B.-K. did not want to go to the hospital and "refused further treatment."

Teresa Stewart, the assistant manager of the Harborview Medical Center Sexual Assault Nurse Examiner Program, testified. Stewart had worked as a sexual assault nurse examiner for 15 years. Stewart testified the amount of compression on the neck that restricts oxygen and blood flow is four to seven pounds. Stewart said victims often refer to strangulation as "choking." Stewart testified that "[a]nybody that's strangled and presents within the first 24 to 48 hours, we treat them not unlike a concussion patient." Stewart said, "It's not uncommon to have sore throat, difficulty swallowing. And then it's not uncommon to have neck pain."

Stewart reviewed the police reports and photographs of C.B.-K. Stewart noted that C.B.-K. "reported it, strangulation, to the officers." Stewart testified that she saw "signs or symptoms of strangulation" on C.B.-K.

> Well, you can see fingerprint marks on the neck. You can see fingernail marks on the neck. You can certainly see, if there was a ligature you would maybe see a ligature pattern injury to the neck. Bruising under the chin is not uncommon to be seen. Bruising behind the ears. Petechiae, which is small, pin point, red spots essentially, on the face, that's caused by burst blood vessels.

Stewart testified there was a horizontal abrasion on C.B.-K.'s neck. Stewart testified that the photographs also show "some marks to her neck that looked — some of them looked like scratches, possible fingernail marks," that were also "consistent with strangulation." Stewart said one photograph showed that "down along the base of her

22

neck, at the very bottom left corner . . . looks like a bruise." Stewart said that the injuries she observed were "consistent with a report of strangulation."

King County jail sergeant Jennifer Schneider testified about the telephone system at the jail. Each inmate has an account number. To make a call, an inmate must "input their account number, their pin number, and then they have to say their name and it has to match the . . . biometrics." Sergeant Schneider said all calls are recorded except for "[a]ttorney calls." The State played 26 redacted recorded telephone calls that King made while in jail.

At the conclusion of the State's case-in-chief, the court granted the prosecutor's motion to dismiss the charge of domestic violence assault in the third degree.

The defense attorney moved to admit victim advocate Mcniel's memorandum into evidence. The prosecutor argued the statements were inadmissible hearsay. The court denied the motion to admit the advocate memo as inadmissible hearsay. King did not testify.

The jury found King guilty of assault in the second degree and witness tampering. By special verdict, the jury found that King and C.B.-K. were family members at the time of the commission of the crimes. The jury found King not guilty of felony harassment.

Bifurcated Trial on Aggravating Factor

After the jury returned the verdicts, the court instructed the jury on whether the crime of assault in the second degree or the crime of witness tampering is an aggravated domestic violence offense. The prosecutor introduced into evidence certified copies of court records from 1994 through 2013 for domestic violence offenses

King committed against other women. The jury returned a special verdict finding the State proved beyond a reasonable doubt that the offense of assault in the second degree of C.B.-K. and witness tampering were "part of an ongoing pattern of psychological, physical, or sexual abuse of multiple victims manifested by multiple incidents over a prolonged period of time."

The court sentenced King to life in prison without the possibility of parole and entered a no-contact order with C.B.-K.

Appeal

King seeks reversal, arguing the court erred by denying his motion to admit Mcniel's advocate memo and admitting the jail calls. King also asserts cumulative error deprived him of the right to a fair trial and his attorney provided ineffective assistance of counsel.

## Exclusion of Evidence

King contends the court violated his constitutional Sixth Amendment right to present a defense by denying his motion to admit the memorandum of SPD victim advocate Mcniel.

We review an alleged denial of the constitutional right to present a defense de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). The Sixth Amendment to the United States Constitution guarantees a criminal defendant " 'a meaningful opportunity to present a complete defense.' " Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)[22] (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)).

---

[22] Internal quotation marks omitted.

The right to present a defense is not absolute. Jones, 168 Wn.2d at 720; State v. Lizzaraga, 191 Wn. App. 530, 553, 364 P.3d 810 (2015). "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988); see also Jones, 168 Wn.2d at 720. The defendant's right to present a defense is subject to "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

We review evidentiary rulings and the decision to exclude evidence for abuse of discretion. State v. Franklin, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014); State v. Garcia, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). A trial court abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds or reasons. Garcia, 179 Wn.2d at 846; State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

King moved to admit the victim advocate memo prepared by Mcniel to show C.B.-K. "already decided not to come" to trial. The advocate memo states, in pertinent part:

> On 08/30/2016 I spoke with the listed victim, [C.B.-K.], at the arraignment for Jimmy King. At that hearing she told me she did not want to appear for court and was not pressing charges. We talked about the fact that the State had pressed charges, the criminal justice process and what to expect as the case proceeded. I spoke on her behalf and [the court] agreed to allow telephone contact. She has maintained contact with me throughout the duration of this case and her stance has not changed.
>
> Prior to the arraignment, I had one contact with [C.B.-K.] in which we did not discuss the facts of the case or trial testimony.

Defense counsel argued the advocate memo was admissible as an exception to hearsay because at the end of trial, Mcniel was out of town and unavailable. ER 804(a)(5) is an exception to the hearsay rule where the witness is "absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance." But as previously noted, the record shows the defense identified Mcniel only for purposes of a hearing on forfeiture by wrongdoing and conceded Mcniel's testimony was "hearsay in the context of a trial." The prosecutor argued the memorandum was inadmissible at trial as hearsay. The court denied the defense motion to admit the advocate memo. The court ruled the memorandum was inadmissible double hearsay.

The court did not abuse its discretion in ruling the statements made to Mcniel were hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Hearsay is generally inadmissible unless an exception applies. ER 802. "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." ER 805.

King also cites State v. Hayes, 165 Wn. App. 507, 265 P.3d 982 (2011), to argue the court should have "read the stipulated Declaration to the jury." But unlike in Hayes, the prosecutor did not stipulate to the admission of the victim advocate memo at trial. The record establishes the prosecutor agreed to stipulate that C.B.-K. told Mcniel that she did not want to testify only for purposes of a hearing on forfeiture by wrongdoing, not for purposes of trial.

For the first time on appeal, King cites ER 806 to argue the court abused its discretion by excluding the victim advocate memo. Under ER 806, if a hearsay statement is admitted, the credibility of the out-of-court declarant is subject to impeachment.[23] King also cites United States v Abel, 469 U.S. 45, 56, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984), to argue for the first time on appeal that evidence that C.B.-K. did not want to testify was admissible to show bias under ER 607.

King has not preserved the right to make these evidentiary objections for the first time on appeal. A party who objects to evidence on one ground may not raise a different ground on appeal. State v. Mason, 160 Wn.2d 910, 933, 162 P.3d 396 (2007). On appeal, a party may raise only objections that are properly preserved unless the party demonstrates manifest constitutional error. State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). Courts will not reverse a trial court's decision to admit evidence where the defendant argues for reversal based on an evidentiary issue not raised at trial. Powell, 166 Wn.2d at 82 ("We adopt a strict approach because trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial."); State v. Kirkman, 159 Wn.2d 918, 934-35, 155 P.3d 125 (2007).

---

[23] ER 806 provides:

> When a hearsay statement, or a statement defined in rule 801(d)(2)(iii), (iv), or (v), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross examination.

Under RAP 2.5(a)(3), "a party may raise . . . manifest error affecting a constitutional right" for the first time on appellate review.

> [T]o qualify as a claim of manifest error affecting a constitutional right, the defendant must identify the constitutional error and show that it actually affected his or her rights at trial. The defendant must make a plausible showing that the error resulted in actual prejudice, which means that the claimed error had practical and identifiable consequences in the trial.

State v. Lamar, 180 Wn.2d 576, 583, 327 P.3d 46 (2014).

The defendant has the initial burden of showing that an alleged error was manifestly unconstitutional. State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). A defendant cannot simply assert that an error occurred at trial and label the error "constitutional." State v. Gordon, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). Even if we assume King has identified an error of constitutional magnitude, he does not show how it actually affected his rights at trial. Gordon, 172 Wn.2d at 676. Further, even if exclusion of the statements C.B.-K. made to the victim advocate was an error affecting a constitutional right, the error was harmless beyond a reasonable doubt. "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

In the jail call 10 days before the arraignment on August 30, King tells his sister what steps C.B.-K. needs to take to negate her statements to the police and get the charges dismissed. The statement C.B.-K. made to SPD advocate Mcniel at the arraignment that "she did not want to appear for court" or press charges against King does not show bias and does not contradict her statements to police or the evidence of witness tampering. The jury also heard evidence that C.B.-K. did not want to testify and

28

did not cooperate in the investigation. SPD Detective Pam McCammon testified that she made several attempts to contact C.B.-K. by phone and in person during the investigation but she was "[n]ever able to locate [C.B.-K.]." In one of the jail calls, C.B.-K. says, "I'm not goin'" to court. In another call, she says, "I want my husband home." Overwhelming evidence established King assaulted C.B.-K. and attempted to induce her not to testify. We conclude beyond a reasonable doubt that the jury would have reached the same result.

Admission of Jail Calls

King contends the court violated his right to a fair trial by admitting jail calls that included references to a "third strike" and a potential "life sentence without the possibility of early release."[24] The record does not support his argument.

Before trial, the State moved to exclude evidence or argument concerning "the [p]enalty [d]efendant is [s]ubject to if [c]onvicted." The State also moved to admit 26 jail calls to prove witness tampering. Defense counsel also objected to evidence of a "final strike case" and evidence "that he's already got significant convictions." Defense counsel noted that "some of the phone calls" reference "final strike status."

The court ordered the parties to determine "what exact language" must be redacted to prevent the jurors from hearing evidence that "this is a strike case." The defense noted objections to specific portions of the jail calls on a copy of the transcript provided to the court. The court and the lawyers carefully reviewed the jail calls to

---

[24] As previously noted, King also contends the court violated his right to a fair trial by not excusing a juror, juror 42, for bias. The record establishes the court excused juror 42 before empaneling the jury. Accordingly, we also need not address the claim that his attorney provided ineffective assistance of counsel by failing to challenge juror 42 for cause.

remove any references to a "strike offense" or the possibility of life imprisonment. The State played a redacted version of the jail calls for the jury.

At the conclusion of the trial, the court instructed the jury, "You have nothing whatever to do with any punishment that may be imposed in case of a violation of the law. You may not consider the fact that punishment may follow conviction except insofar as it may tend to make you careful." During closing argument, the prosecutor addressed the jail telephone calls and the "comments that the defendant made to [C.B.-K.] about I'm going to go to the pen if you show up. I'm going to go to the pen." Consistent with the jury instruction, the prosecutor emphasized, "That evidence was not submitted to you for you to consider what consequence may be happening to the defendant if he's convicted of those crimes. . . . [Y]ou are not to consider that at all when choosing your verdict."

In his opening brief on appeal, King does not identify any specific reference in the jail calls admitted at trial that refer to three strikes or a potential life sentence. For the first time on appeal, King cites ER 404(b) to argue the court abused its discretion by admitting portions of the telephone calls that reference his "potential sentence." King did not preserve this argument on appeal. "An evidentiary error, such as erroneous admission of ER 404(b) evidence, is not of constitutional magnitude." Powell, 166 Wn.2d at 84.

In the response brief, the State points out there is no reference to "three strikes," "strikes," or "life sentence" in the transcript of the redacted jail calls the State played at trial. In his reply brief, King concedes the jail calls were carefully reviewed and heavily redacted. But King argues the jail calls "provide enough information for the jury to infer

30

that Mr. King faced the possibility of a life sentence." In support of his argument, King cites jail calls 9, 15, 19, 20, and 22. These jail calls do not support his argument.

King did not object to calls 9, 19, 20, or 22. King has not preserved the right to challenge the admission of jail calls 9, 19, 20, or 22 for the first time on appeal. Powell, 166 Wn.2d at 84. In any event, we note jail calls 9, 19, 20, and 22 do not create the inference that King faced a life sentence.

Below, King only objected to statements in call 15. In jail call 15 on September 26, 2016, King talks about a plea deal for fourth degree assault. The unredacted transcript of call 15 states, in pertinent part:

| | |
|---|---|
| [KING]: | [W]ell we just gonna have to see. He said you—you wanna shoot your—shoot the dice like that. I said no. That—that—I ain't got no motha fuckin' choice. You know. I said basically. . . |
| FEMALE: | Right. |
| [KING]: | if I take a deal I still gotta do time. Six. . . |
| FEMALE: | Right. |
| [KING]: | So I might as well go for the one—the—the gusto. Because I know they ain't got no witness. |
| FEMALE: | Right. |
| [KING]: | They ain't got witness. . . |
| FEMALE: | Right. |
| [KNG]: | man. See what I'm sayin'? |
| FEMALE: | Right. |
| [KING]: | So they gonna have to pull off some—some heavy shit because they. . . |
| FEMALE: | Right. |
| [KING]: | can't make—they can't make nobody testify.[25] |

The State agreed to redact "Six" because it potentially referred to "the amount of time" the court might sentence King under a plea deal. In context, the statement, "I still gotta do time" does not infer King "faced the possibility of a life sentence."

---

[25] Emphasis added; ellipses in original.

King cites State v. Townsend, 142 Wn.2d 838, 15 P.3d 145 (2001), to argue that any evidence of potential punishment is inadmissible. See Townsend, 142 Wn.2d at 846 (" 'It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed.' ")[26] (quoting Shannon v. United States, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994)). Here, unlike in Townsend, the court did not inform the jury about King's potential punishment and specifically instructed the jury not to consider any punishment that may follow conviction "except insofar as it may tend to make you careful." We presume the jury follows the court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). We conclude the court did err in admitting the redacted version of jail call 15.

Ineffective Assistance of Counsel

King contends he is entitled to an evidentiary hearing to decide whether a new trial is warranted based on the letter C.B.-K. submitted to the court before the sentencing hearing. Because his attorney did not make this argument below, King contends his attorney provided ineffective assistance of counsel by not filing a motion for a new trial.

A criminal defendant has the right to effective assistance of counsel under the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, a defendant must demonstrate both that the trial counsel's conduct fell below a minimum objective standard of reasonable attorney conduct and that the deficient performance prejudiced him. State v. West, 139 Wn.2d 37, 42, 983 P.2d 617 (1999). A defendant must

---

[26] Internal quotation marks omitted.

overcome "a strong presumption that counsel's performance was reasonable." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). When filing a motion would be futile, a defendant cannot demonstrate deficient performance or prejudice. State v. Denny, 173 Wn. App. 805, 811, 294 P.3d 862 (2013).

C.B.-K. submitted a letter to the court before sentencing. In the letter, C.B.-K. states King did not strangle or injure her and asks the court to "please REDUCE my husband's sentence at his sentencing hearing." The letter states, in pertinent part:

> We were in mutual combat that night and it got out of control. 'Out of control', meaning saying hurtful things and shoving each other. My husband did not strangle me. As I was answering the questions of the officers that evening I insisted Jimmy did not harm me; I did not need medical attention or seek medical attention. All I wanted was for us to agree to sleep it off and talk reasonably.

C.B.-K. asked the court to "please reconsider my husband's past, as he is a changed man. My husband, Jimmy L. King loves me and would never ever want to harm me in any way."

At the sentencing hearing, the State requested and the court entered a no-contact order, including prohibiting King from telephone contact with C.B.-K. because King "is still talking to the victim, is still encouraging the victim to submit affidavits . . . . If she sends this letter, then this is how I'm going to win my appeal."

King contends his attorney provided ineffective assistance of counsel by not filing a motion for a new trial based on C.B.-K.'s letter to the court. Because he cannot show that a motion for new trial would have been successful, King cannot establish deficient performance.

To prevail on a motion for a new trial based on newly discovered evidence, a defendant must show that the evidence (1) will probably change the result of the trial,

(2) was discovered after the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. State v. Swan, 114 Wn.2d 613, 641-42, 790 P.2d 610 (1990); State v. Williams, 96 Wn.2d 215, 221, 634 P.2d 868 (1981). The defendant must establish each of the five factors or the motion fails. Swan, 114 Wn.2d at 642.

"Recantation" may be newly discovered evidence. State v. Macon, 128 Wn.2d 784, 799-800, 911 P.2d 1004 (1996). But recantation is inherently questionable. Macon, 128 Wn.2d at 801. "Recantation by an important witness of his or her testimony at the trial does not necessarily, or as a matter of law, entitle the defendant to a new trial." State v. Wynn, 178 Wash. 287, 288, 34 P.2d 900 (1934). "When a defendant is convicted upon the testimony of a witness who later recants, the trial court must first determine whether the recantation is reliable before considering a defendant's motion for a new trial based upon the recantation." Macon, 128 Wn.2d at 804.

King cannot show the court would have concluded the recantation and the statements that King did not strangle or injure C.B.-K. reliable. The photographs of C.B.-K.'s injuries, the testimony of the police officers, and the testimony of sexual assault nurse Stewart support the jury finding King guilty of assault in the second degree by strangulation. Further, C.B.-K. did not in any way recant what she had told the police before she submitted the letter to the court before sentencing. We conclude King cannot show that the court would have granted a motion for a new trial.

Cumulative Error

King contends cumulative error denied him his right to a fair trial. The cumulative error doctrine applies if there are "several trial errors that standing alone may not be

sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000); In re Pers. Restraint of Cross, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). Where, as here, any error had little or no effect on the outcome of the trial, reversal is not required. Cross, 180 Wn.2d at 690-91; State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

We affirm the jury convictions of aggravated domestic violence assault in the second degree and witness tampering.

WE CONCUR: